UNITED STATES of America,
Plaintiff-Appellee,

v.

Amos DAVENPORT,
Defendant-Appellant.

No. 86–2488.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 24, 1987.

Decided July 15, 1987.

Andrew B. Spiegel, Law Office of Andrew B. Spiegel, Chicago, Ill., for defendant-appellant.

Sharon Jones, Asst. U.S. Atty., Anton Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before WOOD, POSNER and MANION, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Defendant tax protestor, Amos David Davenport, was charged in Counts One, Two, and Three with tax evasion for the years 1980, 1981, and 1982, in violation of 26 U.S.C. § 7201 (1982), and in Counts Four through Eight with willful failure to file his tax returns for the years 1980 through 1984, in violation of 26 U.S.C. § 7203 (1982). At the conclusion of a jury trial the district court granted defendant's motion for judgment of acquittal on tax evasion Counts Two and Three. The jury convicted the defendant on the remaining counts.[1]

Three issues are raised: (1) did the defendant have the right to inspect and copy the records maintained by the district clerk concerning selection of prospective jurors;

(2) was the government's evidence sufficient; and (3) was the jury properly instructed.

## I. FACTUAL BACKGROUND

The defendant worked full time on an hourly basis for the same steel company for about twenty years. For the taxable years involved, 1980 through 1984, the defendant's annual gross income varied from approximately $28,000 to $33,300. For the prior years for which the defendant was not charged, 1976 through 1979, the defendant filed his tax returns, but for the years involved in this case he did not. In March 1978 when the defendant filed his 1977 federal income tax return he showed some signs of becoming, as he eventually did, a tax protestor. With his return he enclosed a letter to the Internal Revenue Service ("IRS") in which he explained how he was computing his taxes:

Nowhere in the instruction booklet could I find a computation table that ideally conforms to my particular demands. * * Ex-President Richard M. Nixon and cohorts has had access to such a table apparently, in that he based his taxes on less than one half of one percent .005 percent. * * * This is the formula I am basing my taxes on since the Constitution of the United States of America requires that taxes be levied equal to all.

Based on his self-serving analysis of the Constitution the defendant then requested a refund of $3840.62 from the taxes that had been withheld in accordance with the Form W-4 he had filed with his employer on which he had claimed three exemptions.

Two years later in March 1980 the defendant filed a new Form W-4 on which he merely claimed to be "Exempt" from withholding, which resulted in no federal taxes being withheld by his employer for that year. For some reason the defendant was not satisfied, as manifested two months later by his filing another Form W-4, again claiming to be exempt, and by filing yet another Form W-4 in December of that year on which in addition to his claim of

---

1. The defendant was sentenced to four years imprisonment on Count One, and to three years probation on Counts Four, Five, Six, Seven, and Eight, to run concurrently with one another, but consecutive to the sentence imposed on Count One.

being exempt he advised the IRS that he was a full-time student. In January 1981 he again filed a new Form W–4 claiming 31 allowances, a sizeable number for a full-time student. This reduced the defendant's income tax to a minimal sum. He filed a considerably greater number of Forms W–4 than he did tax returns.

In March 1985 the United States Attorney for the district, as a polite gesture, had hand delivered to defendant's home a letter that advised the defendant and his wife that the grand jury was very interested in their tax paying behavior and suggested that they file tax returns. The defendant's response was not considered by the United States Attorney to be adequate. The defendant advised the United States Attorney that prior to receiving the government's letter he and his wife had done a lot of research and studying on the subject of income tax and that they were continuing their research. Perhaps that "studying" was what the defendant had reference to when he claimed to be a full-time student. In any event he got himself indicted.

At trial an IRS Revenue Agent, Richard Lexby, testified as an expert witness in determining income and computing the resulting income tax liability. His testimony established that the defendant was required to file tax returns for the pertinent years because the defendant's gross income exceeded $6400. Revenue Agent Lexby explained that the defendant's gross income filing requirement of $6400 was computed by adding the exemption allowed for a married couple filing jointly to the individual exemptions for the defendant, his wife, and his daughter.

2. A few selections from the testimony of Mr. Hyde, the off-again, on-again lawyer defense witness, about his tax discussions with the defendant are set forth in the Appendix to this opinion. This distorted analysis fully illustrates what should be rejected by would-be tax protestors in the future.

3. The pertinent parts of 28 U.S.C. § 1867 (1982) provide:
    (a) In criminal cases, before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier, the defendant may move to dismiss the indictment

The defendant did not testify in his own behalf. Only one witness did, John Hyde of Hammond, Indiana, who described himself as a businessman and an Illinois and Indiana lawyer, but who had practiced only off and on since 1952. In general Mr. Hyde testified that he and the defendant attended various meetings sponsored by Citizens For Just Taxation during 1980, and thereafter he conversed with the defendant about tax law. His theory, as Mr. Hyde said he explained to the defendant, was that the income tax is a tax on net receipts after deduction of all expenses, and that wages were therefore not income. Further, he advised the defendant that the tax laws did not apply to him, but only to those working for the government or to officers in corporations. In addition Mr. Hyde stated to the defendant that 98 percent of federal reserve notes are "bogus." The defendant liked what he heard. However, on cross-examination Mr. Hyde admitted that he also advised the defendant that there were cases that had held to the contrary, that wages were income and that the defendant risked criminal prosecution if the defendant followed his advice. At least that much of Mr. Hyde's advice to the defendant was absolutely correct.[2]

## II. ISSUES

### A. Jury Lists

    The defendant sought the right prior to trial to inspect and copy all the records maintained by the district clerk concerning the selection of prospective jurors pursuant to section 1867(f) of the Jury Selection and Service Act ("Act"). 28 U.S.C. §§ 1861–1869 (1982).[3]

or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury.
    \*    \*    \*    \*    \*    \*
    (f) The contents of records or papers used by the jury commission or clerk in connection with the jury selection process shall not be disclosed, except pursuant to the district court plan or as may be necessary in the preparation or presentation of a motion under subsection (a), (b), or (c) of this section, until after the master jury wheel has been emptied and refilled pursuant to section 1863(b)(4) of this title and all persons selected to serve as

The defendant's motion to inspect jury lists without supporting affidavit relied on the authority of *Test v. United States*, 420 U.S. 28, 95 S.Ct. 749, 42 L.Ed.2d 786 (1975), and defendant's sixth amendment rights. The defendant sought in particular the completed "Juror Qualification Questionnaires so that a meaningful review of the potential jurors can be conducted by the Defendant." [4] The defendant alleged that the jury selection plan had the effect of systematically excluding from the master lists disproportionate numbers of students, blacks, people with Latin surnames, and citizens who are not registered to vote. As an example defendant claimed that in one Chicago ward in a particular primary election only 103,000 of the 257,000 Hispanics eligible to register to vote had in fact registered.[5] The defendant recognizes the validity of using voter registration lists as a primary source for selecting prospective jurors, but argues that the lists must be supplemented from other sources. The defendant also relies on the general policy statement in section 1861 of the Act that all citizens shall have the opportunity to be considered for jury service in the district courts, and the provision in section 1863(b)(2) that the plan shall prescribe other sources of names in addition to voter lists where necessary to foster that policy.

We discussed similar issues in *United States v. Gometz*, 730 F.2d 475 (7th Cir.) (en banc), *cert. denied*, 469 U.S. 845, 105 S.Ct. 155, 83 L.Ed.2d 92 (1984). In *Gometz* we considered the fact that although there was only a 30 percent return to the clerk's office of juror qualification forms mailed to registered voters, the response generated over 4000 qualified people for the jury wheel. Gometz had objected to the small numbers of blacks in the wheel and even argued that persons marked by a certain type of personality, those who are "anti-authoritarian" and therefore would ignore the system, would also be excluded. We held, however, that it is the size of the sample which is significant rather than its ratio to the population from which it is drawn that determines whether the method is satisfactory. The Act, we held, does not require that prospective jurors be conscripted to satisfy some rigid and unrealistic formula.

The jury plan for the Northern District of Illinois does have a provision in compliance with the Act that at such time as the court may find that the use of other prospective juror sources is necessary to foster the policy of the Act the court may direct that other sources be used. It is left to the court to determine the other sources whenever that need may arise. The defendant, however, is not satisfied because the other possible sources are not identified in the plan itself. The defendant claims that over 20 percent of the persons who are eligible for jury duty are not registered voters and are therefore excluded, thereby making the use of other sources necessary.

*Test v. United States*, 420 U.S. 28, 30, 95 S.Ct. 749, 750–51, 42 L.Ed.2d 786 (1975), holds that a criminal defendant has an essentially unqualified right to inspect jury lists. That brief three-page opinion does not fully resolve the present case although the defendant has attempted to cast his motion in a *Test* context. The court of appeals in *Test* had not addressed the issue although the district court had denied the motion to inspect the lists. The Supreme Court remanded the case to give the defendant the opportunity to inspect the jury lists so that he might attempt to support his challenge to jury selection procedures. No documents were involved in *Test* other than jury lists. *Test* does not hold that

---

jurors before the master wheel was emptied have completed such service. The parties in a case shall be allowed to inspect, reproduce, and copy such records or papers at all reasonable times during the preparation and pendency of such a motion. Any person who discloses the contents of any record or paper in violation of this subsection may be fined not more than $1,000 or imprisoned not more than one year, or both.

4. The motion sought grand jury as well as petit jury records, but no issue about grand jury records has been raised on appeal.

5. The government does not challenge the defendant's standing to make this claim even though the defendant is white and does not fall within any of the groups he alleges are typically under-represented. *United States v. Gometz*, 730 F.2d 475, 478 (7th Cir.) (en banc), *cert. denied*, 469 U.S. 845, 105 S.Ct. 155, 83 L.Ed.2d 92 (1984).

completed juror questionnaires must be made available to defendants in addition to jury lists. Neither party has claimed in the present case that the government had access to the questionnaires, while the defendant did not.

Prior jury lists on a monthly basis are available as a public record in the clerk's office. Defendant has shown no reason why those lists would not be adequate for his purposes. If the system is not working in accordance with the Act's requirement the available lists could be of use in establishing an alleged deficiency. Defendant has not demonstrated why other records besides those available jury lists might be required.

■ The Act itself, in section 1867(f), provides that the contents of records or papers used by the clerk shall not be disclosed unless those records' contents are shown to be "necessary" for the preparation of a motion to claim, under section 1867(a), that there has been a "substantial failure to comply" with the Act. The defendant has not shown why more is needed than what is already available or why the statutory prohibition of disclosure needs to be breached. Neither has the defendant set forth any "substantial failure to comply." Even if defendant's speculation is correct about those persons who are not adequately represented on the voter registration lists no substantial failure would exist. There is no need to search for and use other sources. Voter lists take in a cross section of the community of sufficient magnitude to satisfy the Act in the absence of some particular circumstance or scheme undermining the worthy purposes of the Act. The defendant claims nothing of that sort, only that the voter registration lists do not have enough names from certain categories, particularly Hispanics. The jury lists already available to defendant could have been used to try to show some substantial Hispanic disparity. Relying merely on names might not always be completely accurate for that purpose, but what was available was not used here.

Defendant is making a claim that appears to us to lack any bona fide basis, a frivolous exploration. What defendant really desires, and what he particularly asked for in his motion, were the juror questionnaires completed and returned to the clerk. Those questionnaires contain prospective jurors' home addresses and other personal information. To give the defendant an absolute right of routine access to all materials would be an amendment of the Act. The defendant may be seeking those forms as an aid for voir dire examination purposes, but that is not the purpose of the questionnaires. If these completed judicial jury forms were released to defendants generally there would exist the possibility of substantial abuse of the information the forms contain, which could have serious consequences for individual jurors and the system.[6]

## B. Sufficiency of the Evidence

■ The defendant's motion for judgment of acquittal at the close of the government's case was allowed only as to Counts Two and Three, which were tax evasion charges for the years 1981 and 1982. The district judge found the government's proof insufficient to show that the defendant was not entitled to the 31 allowances the defendant claimed on his new Form W–4 filed in January 1981.[7] However, the district court denied the defendant's motion as to Count One, which was the tax evasion charge for the year 1980. On the Form W–4 filed for that year the defendant claimed to be exempt because he was a full-time student, whereas it was clear he was still regularly employed as he

---

6. If we had found any merit to defendant's claim then we would have had to decide whether to remand to permit the defendant to examine other documents, while leaving his conviction undisturbed, *United States v. Studley*, 783 F.2d 934, 938 (9th Cir.1986), or as defendant would prefer to set aside his conviction, *Government of Canal Zone v. Davis*, 592 F.2d 887, 889 (5th Cir.1979), but we need not reach that remedy selection.

7. The defendant until 1980 had claimed only three exemptions to which he was entitled. In the context of this case it is clear that if there was any doubt the trial judge gave the defendant full benefit of it in allowing the motion as to Counts Two and Three.

had been for prior years at the steel company.

The defendant claims that the trial judge should also have allowed his motion as to Count One because the Form W–4 in question, on which the defendant claimed to be a full-time student, was dated December 18, 1980, and was therefore only in effect a few weeks until the end of the year, or no later than January 18, 1981, at which time the defendant filed a new Form W–4 on which he claimed the 31 allowances. That argument is of no moment because the Form W–4 filed on December 18, 1980, was the third false Form W–4 the defendant had filed for that year and obviously was a part of his scheme to avoid paying taxes for that year.

■ The defendant also claims that there was reasonable doubt that he had a substantial tax liability for 1980. This argument is based on the claim that he could have been entitled to additional deductions, if itemized, above the standard deduction and that those unknown deductions are hidden in his extensive use of cash. Subtracting the $1538.32 withheld in taxes by the defendant's employer in 1980 Revenue Agent Lexby calculated a tax deficiency owing of $3358.68. Revenue Agent Lexby gave the defendant credit for any possible deductions that could have been itemized.

Our standard of review of a sufficiency of the evidence claim has long been recognized to be that we will affirm the conviction if after viewing all of the evidence, along with reasonable inferences in the light most favorable to the government, there is substantial evidence supporting the verdict, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), or if there is at least some evidence from which a jury could find guilt beyond a reasonable doubt, *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir.1983), *cert. denied*, 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984).

It is equally clear that to sustain a conviction for income tax evasion the government must prove beyond a reasonable doubt: (1) an affirmative act constituting an evasion or attempted evasion of the payment or collection of taxes; (2) the ex-

istence of a substantial tax deficiency; and (3) that the defendant acted willfully. *Sansone v. United States*, 380 U.S. 343, 351, 85 S.Ct. 1004, 1010, 13 L.Ed.2d 882 (1965); *United States v. Foster*, 789 F.2d 457, 459 (7th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 273, 93 L.Ed.2d 249 (1986).

Defendant contends mainly that the government did not establish the existence of a substantial tax deficiency. Revenue Agent Lexby testified that he analyzed the bank account records of the checking account into which the defendant deposited his steel company paychecks. This analysis revealed the defendant's extensive use of cash. The records showed total deposits of $133,000 from 1980 to 1984 from which well over half was withdrawn by the defendant in the form of checks made out to cash, all in amounts of $100 or more. The defendant also purchased two automobiles and made the car payments all in cash.

In response to Revenue Agent Lexby's analysis the defendant argues that he had some excess unidentified deductions he was entitled to claim which were unaccounted for by Revenue Agent Lexby; but the defendant's argument is all theoretical. The government easily showed the amount of the defendant's wages from his employer. Some cancelled checks were introduced to help substantiate legitimate deductions, an example being the defendant's real estate taxes. This type of legitimate deduction generally may also include such things as medical expenses, charitable contributions, casualty losses, and interest, among others. The defendant's other tax records in evidence showed no claim for excess itemized deductions in prior years. The evidence as a whole was sufficient to preclude any significant possibility that the defendant had excess deductions that he would have been entitled to claim if he had itemized them. His specific deductions were below the standard deduction for which he was given credit.

It is neither necessary nor reasonably practicable to require the government to prove that there are no other conceivable deductions of any sort to which the defendant might be entitled in the absence of

some indication that they may in fact exist. To require otherwise would force the government to trace all the miscellaneous payments the defendant had made. If other than theoretical deductions actually existed, the defendant had a self-help opportunity to prove the existence of the deductions, an opportunity he chose not to take. *United States v. Lacob,* 416 F.2d 756, 759–60 (7th Cir.1969), *cert. denied,* 396 U.S. 1059, 90 S.Ct. 755, 24 L.Ed.2d 754 (1970).

There have been many greater tax deficiencies resulting from tax evasion which we see on appeal, but the little more than $3000 in taxes the defendant evaded paying will amply suffice for the purpose. *United States v. Cunningham,* 723 F.2d 217, 231 (2d Cir.1983) (holding additional tax of $2617 to be substantial), *cert. denied,* 466 U.S. 951, 104 S.Ct. 2154, 80 L.Ed.2d 540 (1984); *United States v. Siragusa,* 450 F.2d 592, 595–96 (2d Cir.1971) (holding taxes due of $900, $2209, and $3956 over three years to be substantial), *cert. denied,* 405 U.S. 974, 92 S.Ct. 1195, 31 L.Ed.2d 248 (1972).

### C. Instructions

The defendant lastly complains that the district court improperly instructed the jury on the element of willfulness and on his corresponding defense that he had a good faith misunderstanding of the law. He claims that the district court improperly modified his theory-of-defense instruction. In addition the defendant argues that the district court committed error when it refused to give his lesser-included-offense instruction pertinent to Counts One and

Four, arguing that failure to file is a lesser included offense of tax evasion. It is not new law that jury instructions are reviewed as a whole and not merely on the basis of "one single paragraph, sentence, phrase or word." *United States v. Lang,* 644 F.2d 1232, 1240 (7th Cir.), *cert. denied,* 454 U.S. 870, 102 S.Ct. 338, 70 L.Ed.2d 174 (1981).

The jury was fully and correctly instructed on the "willful" requirement as a voluntary, intentional violation of a known legal duty. *United States v. Pomponio,* 429 U.S. 10, 12, 97 S.Ct. 22, 23, 50 L.Ed.2d 12 (1976).[8] The defendant did not object to that instruction.

The jury was then instructed on the defendant's theory of his defense to the effect that he claimed to have relied in good faith on attorney Hyde's advice and therefore what he did was not willful.[9] We find no fault with that instruction as it relates to reliance on the advice of an attorney. *United States v. Baldwin,* 307 F.2d 577, 579 (7th Cir.1962), *cert. denied,* 371 U.S. 947, 83 S.Ct. 501, 9 L.Ed.2d 497 (1963); *United States v. Samara,* 643 F.2d 701, 703 (10th Cir.), *cert. denied,* 454 U.S. 829, 102 S.Ct. 122, 70 L.Ed.2d 104 (1981).

Next, the district judge instructed the jury on the meaning of good faith which causes the defendant to question, as have others,[10] the validity of our decision in *United States v. Moore,* 627 F.2d 830 (7th Cir.1980), *cert. denied,* 450 U.S. 916, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981). *Moore* defines our view of a defendant's good faith reliance on an attorney's advice. The advice need not be legally correct, but the

---

**8.** In addition the jury was instructed that "knowingly" means that the defendant realized what he was doing and was aware of the nature of his conduct and did not act through ignorance, mistake, accident, or negligence, any of which would not support a finding of willfulness or knowledge.

**9.** The instructions in full stated:

It is the defendant Mr. Davenport's theory that he did not report his wages as gross income for the years 1980, 1981, 1982, 1983 and 1984 because Mr. Davenport relied upon the legal advice of attorney John Hyde in good faith. And such reliance precludes a finding of wilfullness [sic] so that the defendant is not guilty of any of the charges.

Absence of wilfulness maybe [sic] shown by evidence showing that the defendant did not report the income in question on the advice of his attorney, but this is not a defense to the crimes charged unless you find that the defendant:

1) made a full disclosure of all the facts to his attorney; and

2) relied in good faith on his attorney's advice.

**10.** *See United States v. Foster,* 789 F.2d 457, 461 (7th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 273, 93 L.Ed.2d 249 (1986); *United States v. Thomas,* 788 F.2d 1250, 1255 (7th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 187, 93 L.Ed.2d 121 (1986).

defendant must honestly and reasonably believe that the advice was correct and therefore relied on it. The instruction, the defendant argues, in requiring that his alleged misunderstanding of the law be "reasonable," strips the *mens rea* requirement from the Internal Revenue Code in direct conflict with *United States v. Murdock,* 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381 (1933), *implicitly overruled on other grounds, Murphy v. Waterfront Commission,* 378 U.S. 52, 77, 80, 84 S.Ct. 1594, 1608, 1610, 12 L.Ed.2d 678 (1964); *United States v. Bishop,* 412 U.S. 346, 93 S.Ct. 2008, 36 L.Ed.2d 941 (1973); and *United States v. Pomponio,* 429 U.S. 10, 97 S.Ct. 22, 50 L.Ed.2d 12 (1976).

We do not read *Murdock* as requiring instructions different from those given. *Murdock* was a case in which the defendant declined on the basis of self-incrimination to answer questions when summoned before an IRS agent, and he was therefore prosecuted for willfully failing to supply information. *Murdock* explains that "willfully" is not used in the revenue acts so that "a person, by reason of a bona fide misunderstanding as to his liability for the tax, as to his duty to make a return, or as to the adequacy of the records he maintained, should become a criminal by his mere failure to measure up to the prescribed standard of conduct." 290 U.S. at 396, 54 S.Ct. at 226. As a result the *Murdock* Court held that the defendant was entitled to the benefit of a good faith and actual belief instruction. In the present case similar instructions were given.

In *Bishop* it was held that "willfully" means as much when used in a misdemeanor revenue statute as when used in a felony revenue statute. It embodies an element of *mens rea,* bad purpose, or evil motive, to "separate the purposeful tax violator from the well-meaning, but easily confused, mass of taxpayers." 412 U.S. at 361, 93 S.Ct. at 2107. We see no serious conflict between the instructions given and the *Bishop* holding.

*Pomponio* holds that "willfully" in the revenue code context "simply means a voluntary, intentional violation of a known legal duty." 429 U.S. at 12, 97 S.Ct. at 23. In addition it holds that no additional good

faith instruction need be given. The defendant in the present case, however, got both.

We have previously considered cases that disagree with *Moore, United States v. Phillips,* 775 F.2d 262, 264 (10th Cir.1985), and *United States v. Aitken,* 755 F.2d 188, 191–93 & n. 2 (1st Cir.1985), which are good expressions of a contrary view. But we again decline for the purposes of this case to abandon *Moore. See United States v. Sato,* 814 F.2d 449, 451 (7th Cir.1987); *United States v. Thomas,* 788 F.2d 1250, 1255 (7th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 187, 93 L.Ed.2d 121 (1986). In *United States v. Bressler,* 772 F.2d 287, 291 n. 2 (7th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 852, 88 L.Ed.2d 892 (1986), we explained that "[t]he reasonableness requirement is intended to give the jury a method by which they can distinguish between a bona fide misunderstanding of the law and obdurate refusal to acknowledge (present in so many tax protester cases) what the law indeed does require." *Id.* The jury needs to be able to take reasonableness into account for that purpose.

The defendant also finds fault with the theory-of-defense instruction, which was a modification of the instruction he offered. The modification eliminated misstatements of the law and the excess language that was already covered by other instructions. The jury was instructed that it was defendant's theory that he did not report his income because he was acting upon the legal advice of attorney Hyde. The instructions as a whole fully, adequately, and correctly advised the jury of the law it was to apply.

Even if the defendant's preferred instructions had been given, the jury still would have been entitled to convict the defendant. He had paid taxes on his wages in the past and he knew how to use the Form W-4. It was obvious that the defendant was no full-time student, but at most was a self-described part-time student only studying ways to avoid paying his taxes. His lawyer, upon whose advice the defendant claims he relied, admitted on

cross-examination that he advised the defendant that he was running the risk of criminal prosecution if the defendant followed his tax advice. In addition the defendant advised the IRS that he was going to apply the Nixon tax formula, as he saw it,. in preference to what he understood to be the formula required by the IRS. He claimed on his Forms W–4 to be exempt, but he was aware that he was not exempt from paying taxes merely because he would rather not pay. His extensive use of cash, a practice common among tax evaders, was not for mere convenience. Moreover, he did receive correct legal advice in a letter from the United States Attorney advising him to pay his taxes to avoid indictment but he ignored that advice to this end.

■ The defendant also argues that his conviction on Counts One, tax evasion for 1980, and Four, willfully failing to file a return for 1980, should be reversed because the district court refused to give a lesser-included-offense instruction. That refusal was correct because the one is not the lesser included offense of the other. They are separate and distinct offenses and conviction of both does not violate the double jeopardy clause. We have recently so held. *United States v. Foster*, 789 F.2d 457, 460 (7th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 273, 93 L.Ed.2d 249 (1986). The elements are different in each of the separate crimes and the jury was separately instructed as to both offenses which were separately charged. The jury could have found the defendant guilty of neither, one, or both, and it chose both. This distinguishes *Sansone v. United States*, 380 U.S. 343, 344, 349–50, 85 S.Ct. 1004, 1006, 1009, 13 L.Ed.2d 882 (1965), because in that case only the greater offense was charged, not both the lesser and the greater.

Defendant's guilt was firmly established before a jury properly instructed. Therefore the defendant's conviction is

Affirmed.

### APPENDIX

Following is an excerpt from the direct testimony of defense witness John Hyde, a lawyer admitted to practice in Indiana and Illinois:

A. So he [the defendant] said, can you explain it to me, John? I said, well, it will take a little while, you got a half an hour. He said, oh, yeah, take—got a lot of time.

So I told him—oh, he said I have been doing some interesting reading about—in the Bible. He says, Leviticus calls for a system of honest weights and measures or just weights and measures. I don't know which the word was. And he said, you know, also the Bible speak [sic] of money as the fruit of the earth, substances from the earth. And that's why we use gold and silver.

Now, I knew—I said, well you view it from the standpoint, Dave, that the gold and silver are used because they are honest and the politicians can't create them. But I think there is another more significant point about why gold and silver got to be used as money instead of printing press paper.

And I said—he said, what's that? And I said, well, it's the fact that gold and silver from the beginning of history of mankind have been used for trading purposes. And the reason that they have been used for trading purposes is because everbody [sic] knows their value. Nobody questions what an ounce of gold is worth. And that bears on the issue of what is good money, Dave, because money is merely a substitute for some other kind of consideration in a bargain and sale or a trade of any kind.

I says, now, you have got—this is basic, you have got to understand, if you are going to use this defense or use—or act upon this information, Dave, you got to understand the principles.

Everything that people do with each other, all the business they conduct, are essentially trades. And in every trade, the principal [sic] motivating both parties is that they believe they are getting as much from the other guy as they are giving to him.

In other words, what is swapped in every trade is equal in value.

Now, if you are going to substitute money, instead of giving a person a pig for a fur coat, you are going to give him $20 for the fur coat, then that $20 has got to have

the same value as a pig. It can't be a chimera, it can't be an illusionary value. It has got to be real solid value. So that's why gold and silver make good money. Because you can substitute them and the guy that takes the gold knows he is getting something just as valuable as anything else he might have gotten in the world. So he makes the deal.

Q. Did you explain to Mr. Davenport how that would affect the question of income tax?

A. Yeah, well, he asked me that question. He says, yeah, but John, that's not the money. How does that affect a person's income tax status? I said, that's basic. Your income tax is a tax not on value, but on excess value. What do you—you mean profit and gain, John? Yes, that's exactly what I mean. An income tax is not a tax on gross receipts. It's a tax on net receipts after deduction of all expenses.

I said, so the question of whether you have received anything, received value that can constitute a profit or a gain, gets right down to the nub of what the heck is value. Money of gold and silver has unquestioned value.

Now, in order to compute profit or gain, you have to compare the difference between two separate transactions, each transaction consisting of an equal exchange.

Q. Okay. Why is the question of value even relevant to the discussion of taxes?

A. Because if you receive less value than you give up, it's impossible for you in a transaction to have any income; i.e., profit or gain, which the government can tax as profit or gain, and that's all they can tax is profit or gain.

And that was held in the Eisner and Macomber case by—ruled on by the Supreme Court, what income is. Income is profit or gain. Profit or gain is the difference between your cost of acquisition plus your investment and your sale price. If your sale price exceeds what you had in it, you have realized some profit or gain. Like an example: If you buy a house for 20 thou—thousand, and you sell it later on for 50,000, well, maybe you put in 10,000 in improvements in it, so you got 30,000 in that house, but you have received 50 for it, so you net 20,000 and that's taxable gain. Possibly.

I mean it's—it's—profit can be subjected to the tax laws if you are a person who is subject to the tax laws in the first place.

Q. Okay. Did you and Mr. Davenport discuss that subject, whether or not Mr. Davenport was subject to the tax laws?

A. Yes. I did. I said, you know, the way I—

Q. This is at the same meeting still.

A. Yeah, because this—because he was trying to get me to explain to him how the subject of money bore on taxes.

Q. Okay.

A. Actually that question of being subject is a little—is a different question, but we did discuss it.

And I told him the way I interpret the tax code—like in section—I think it's 3401(c)—it says that the persons liable for the tax are all government employees, employees and officers of the territories and states, and officers of corporations.

I said so, Dave, if you are not working for a government or you're not an officer of a corporation, then the tax laws don't apply to you. Unless somehow you have got other income that is that—other receipts that can be called profit or gain and thence income which might be subject to tax.

Because even if you got income, you're not necessarily subject to the tax law. Because under Section 6012, you got to have—now—then you had to have a thousand dollars of extra income in '80 when I was talking to Dave. Today I think that you have got to have 3000 in profit or gain before you even have to file a return. And I said, Dave, if you don't—I think he was working at a steel mill at the time. I said, Dave if all you've got is compensation from the steel mill, you haven't got a blessed farthing of income. Any you have to have at least a thousand dollars worth of income; i.e., profit or gain, before you're obligated to file a tax return.

Q. Were you telling Mr. Davenport that the compensation he received from his employer had no value?

A. Oh, not at all.

Q. What did you say in that regard?

A. Federal reserve notes—and then—since 1913, most of the currency, about 98 percent of the currency in circulation in this country has been bogus federal reserve notes. And they have value in the sense that you can swap them for things you need, but it does not follow that because you can swap them for things you need, you have realized income.

Now, David said, I don't follow you there. And I said, well, put it this way: If you sell your labor for ten bucks an hour, then you are making an even exchange with your employer. He is giving you ten bucks and you are giving him $10 worth of effort and experience and education and training and what not. That's an even swap.

Now, if by that—if that swap is going to result in profit or gain to the laborer, it has to be because he got the labor for less than $10.

Where did he get the labor? Well, from god he got the capacity to labor, and the intelligence to think. But that didn't make him worth a dime in the marketplace. He had to grow up first and acquire strength. He had to go to school and acquire education. He had to get a job or go out and get some training and acquire practical experience. In order to produce the labor which anybody would buy, he had to develop a skill so that there was some utility to what he could offer, otherwise, who would pay for it.

Q. Well, were you telling Mr. Davenport that those types of expenses were deductible?

A. I was telling him in my view—

\* \* \* \* \* \*

Q. Okay. Do you recall anything else that you said to Mr. Davenport at that meeting in February or March of 1981?

A. Well, I told him that so that in order to derive a tax base for that labor, it was practically impossible to compute what he had invested. And that I recalled him the case of Rayathon versus Commissioner, where it said that if the basis for—the tax basis of an item was speculative, then any profit or gain by its exchange was conjectural and wouldn't be recognized.

So I said, since the tax base of labor is so speculative and difficult of reasonable ascertainment, then the tax base of labor has to be equal to the item for which it was exchanged. So if you exchange your labor for ten bucks, your basis is $10 and you—the receipt do [sic] not exceed the basis; therefore, you can't realize income.

On that transaction, now that—now, you have sold your labor, you have got some currency in your hand. What can you do with it? The currency has value because Congress has legislated that this paper, which has no intrinsic value, is legal tender. In other words, they have certified that this worthless paper is—has the same value as gold. I said, Congress has lied in doing this, Dave. And you better realize this.

That every Congressman that has—okays that law is guilty of malfeasance in office.

So I said, nevertheless, they have said it's legal tender. So that everybody has to take this paper, whether they want it or not. If it weren't legal tender, they wouldn't touch it with a ten foot pole. But since it is legal tender, now that you have sold your labor and you have got this legal tender in your hand, you can take it out and spend it for what you need.

But, does this mean that you have got income? No way.

And he says, how is that, John? I said, remember that in order to determine if you have got profit or gain, you have got to—the transaction in which you acquired this paper and the transaction in which you spend the paper.

Now, unless you can get more value when you spend the paper, than the value you gave up to get the paper, you can't possibly have income profit that could be taxed. Even though you get a four-door automobile, you haven't got income. Because each exchange is equal.

Now, let's compare the exchange when you gave your $10—your work and you got ten dollars or a thousand dollars of [sic] ten thousand dollars, doesn't make any difference, those pieces of paper have a certain buying power. Ten thousand of them would buy a new Ford.

However, I said, when you spend that paper, it doesn't have that same buying power because for the last 59½ out of the 60 years, we have had inflation. Sometimes we have had raging inflation. And I think in '80 or in '81, we were having raging inflation.

And I think inflation was 12, 15 percent then, if my mind serves me correctly.

So if you take a paper in on day one, and on day ten you spend it, it has decreased in buying power because inflation cheapens the purchasing power or the buying power of money.

Therefore, when you spend that money on day ten, you cannot—it has less buying power than it had when you got it. So you aren't going to get as much value on day ten as you gave up on day one.

So in your equation for computing profit and gain, the same house deal, I spent 20,000 for the house, I put 10,000 in it, and then the market dropped out of real estate and I only could get 25 for it. I had a loss. You had a loss when you spent that ten—that money to buy that Ford.

So that although this paper may work as a medium of exchange so that we can continue trading, when it comes to computing a tax, a profit, or laying a tax on a profit, the profit is nonexistent. So there can't be any liability for tax.

Q. Okay. So did Mr. Davenport say anything with regard to what you were telling him?

A. Well, he indicated, I thought, then, that he understood what I was talking about.