USA v. Burke, et al.                  CR-96-050-M   10/28/97

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


United States of America

    v.                                    Criminal No. 96-50-1-6-M

John Burke, Stephen Burke,
Matthew McDonald, Patrick McGonagle,
Michael O'Halloran, and Anthony Shea


**O R D E R**

    On the first day of jury selection, September 16, 1997, Defendant Patrick McGonagle challenged the district's plan for selecting juries and moved to dismiss the petit jury and stay proceedings in his criminal trial until a new petit jury could be seated. See 28 U.S.C. § 1867(a). He argued that the procedure employed to select potential jurors violated provisions of the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861, et seq. (the "Act"), as well as his rights under the Fifth and Sixth Amendments to the United States Constitution. McGonagle's co-defendants joined in his motion, and the government objected.

    On September 23, 1997, a hearing was held on the motion. Bonnie Franklin, the Deputy Clerk of Court authorized to administer the district's plan for selection of grand and petit jurors, testified. Counsel for the government, counsel for the defendants, and all defendants were present.

## Background

On May 1, 1997, the grand jury returned a fifteen count second superseding indictment, charging that the six named defendants committed various felony offenses, including racketeering, conspiracy to racketeer, conspiracy to commit armed robberies, and bank robbery. On July 24, 1997, the court began the process of picking a jury by mailing summonses and questionnaires to prospective jurors whose names were selected from the qualified jury wheel. Based upon the responses provided in those questionnaires, some potential jurors were excused for cause, leaving a pool of approximately 230 potential jurors. Approximately 75 members of that pool were summoned to appear at the courthouse on September 16, 1997, to begin the initial stages of jury selection.

Prior to jury selection, the court provided all counsel with a written copy of its proposed voir dire and afforded them an opportunity to comment and suggest changes. After making appropriate changes, the court provided all members of the jury panel with a written copy of the voir dire and asked them to review it carefully (both in advance of voir dire and as the court conducted it).

After the court completed its general voir dire of the entire panel, the panel was escorted out of the courtroom and returned to the jury assembly room. Individual members were then

2

selected at random from the panel.  Each person selected was escorted back to the courtroom for additional, individual, voir dire.  The court asked each potential juror if he or she had any affirmative responses to the questions posed during general voir dire, or any problems or concerns that might affect his or her ability to serve as a fair and impartial juror.  Based upon the prospective juror's response(s), the court made further inquiries.  Counsel for the government and for each defendant were also afforded an opportunity to conduct individual voir dire based upon the court's questions and the prospective juror's responses.  The potential juror was then escorted into a nearby anteroom, after which challenges were entertained.  The potential juror was then returned to the courtroom, at which time the court either excused the prospective juror for cause or found the juror qualified to serve and instructed him or her to return when called for further selection procedures (i.e., peremptory challenges).[1]

## Discussion

------

    Although this is not the court's normal practice in selecting a jury, the court's traditional practices were necessarily modified.  Given the comparatively large number of attorneys and defendants, confidential side-bar conferences were not feasible.  Accordingly, to avoid exposing the entire jury panel to each prospective juror's comments, questions, concerns, and potentially personal problems, questioning of individual potential jurors took place in open court, but with the remaining members of the jury panel not present.  Likewise, the court heard counsels' objections to the seating of potential jury members outside the presence of the prospective juror and members of the panel.

McGonagle raises three challenges to the manner in which his petit jury was selected. First, he claims that the procedures employed by the Plan Administrator in selecting names from the court's master jury wheel were inconsistent with the provisions of the Act. Next, he claims that those procedures violated his constitutionally protected right to have jurors randomly selected from a fair cross section of the community. Finally, he claims that he was prejudiced because some potential jurors returned incomplete juror questionnaires to the clerk's office, i.e. questionnaires that "provided substantially less information to defendants' counsel . . . and impaired [defendants'] ability to select a jury on the basis of objective criteria." Defendant's Motion to Stay at 7.

I.    The Jury Selection and Service Act.

The Act declares it to be the policy of the United States that "all litigants in Federal Courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861. To implement that policy, the Act requires each district court to develop and implement a written plan for the selection of grand and petit jurors. 28 U.S.C. § 1863(a). The Act also describes numerous requirements which the written plan must meet.

4

In order to obtain the relief he seeks, McGonagle must show a "substantial failure to comply" with the provisions of the Act during the selection of the petit jury in his case. 28 U.S.C. § 1867(a). A "substantial failure to comply" with the Act occurs when "the alleged violations subvert the underlying principles of the Act." United States v. Marrapese, 610 F.Supp. 991, 998 (D.R.I. 1985) (Selya, J.). And, as then District Judge Selya noted, "mere technical deviations from the Act or even a number of them are insufficient." Id. (citation omitted). A party challenging the procedure by which a grand or petit jury is selected must demonstrate that the alleged noncompliance with the Act "resulted in a serious violation of the Act and, thus, its underlying tenets." Id. (citation omitted).

A.    The District of New Hampshire's Plan.

In 1988, the United States District Court for the District of New Hampshire submitted its "Plan for the Random Selection of Grand and Petit Jurors for Service in the District of New Hampshire" (the "Plan") to the circuit council for its approval, which was forthcoming. Under the terms of the Plan, the court's master jury wheel is compiled using: (1) the general election voter registration list from each city and town in New Hampshire; and (2) the list of active licensed drivers in the State of New Hampshire, as maintained by the Division of Motor Vehicles. Every four years, immediately following the national general election in November, the Plan Administrator solicits from each

5

New Hampshire city and town a list of all registered voters.[2]
She also solicits from New Hampshire's Department of Motor
Vehicles a list of 10,000 names, randomly selected from the
registry of active licensed drivers.

After that collection effort is completed, the Plan
Administrator sends the names to the Southern District of New
York, which has been authorized to perform the administrative
task of compiling a master jury wheel for this district.  That
compilation is generally finished some time between May and July
of the following year.  A large number of names (about 5,000) are
then selected from that list and the Plan Administrator mails
those people qualifying questionnaires.  Based upon the
information returned on those questionnaires, the Plan
Administrator compiles a "qualified jury wheel" containing the
names of people facially qualified to serve as jurors.  The
qualified jury wheel is then used as a source list, from which
the names of potential grand and petit jurors are selected.

The Act requires a plan for the random selection of grand
and petit jurors to have certain elements.  Among other things,
the Act requires that:

---

        Voter registration data taken after the national general
election is thought to be better representative of the population
than data collected in off years because the national elections
generally draw the largest number of citizens to register and
vote.

> The plan shall provide for periodic emptying and refilling of the master jury wheel at specified times, the interval for which shall not exceed four years.

28 U.S.C. § 1863(b)(4). To comply with that statutory requirement, this district's Plan provides that:

> The Master Jury Wheel shall be emptied and initially refilled, as herein provided, once every four years, within nine months following the November General Election, and may be maintained either manually or by the use of a properly programmed electronic data processing system or device.

The Plan, § 5 at 8.

Because it takes time and administrative effort to collect the voter registration data from all of New Hampshire's cities and towns, and motor vehicle license data from the DMV, and then to compile all that data in a form useable to refill the master and qualified jury wheels, the Plan allows a nine month window following the national general election in which to complete the process. Regardless of when the administrative compilation is finished (within the nine months allowed), however, the Plan Administrator does not empty the master jury wheel in use, or refill it with the newly compiled data, until August 1 in the year following a national general election. Consequently, citizens contacted for potential jury service on or before July 31 in a year following a national general election are selected from the master jury wheel that was put into service on August 1, 3 years and 364 days earlier (at most). Citizens contacted for

7

service on or after August 1 following a national general election are chosen from the master jury wheel put into service on August 1 of that year.

B.   Compliance with the Act.

McGonagle argues that the master jury wheel that provided the names of his jurors was "completed" on June 16, 1993 (following the November 1992 national election).  Because juror summonses and questionnaires were mailed to prospective jurors in this case on July 24, 1997, McGonagle claims that more than four years elapsed between the "completion" of the master jury wheel (June 16, 1993) and its "use" in selecting potential jurors for this case (July 24, 1997).  He concludes, therefore, that the Plan, at least as applied in this case, violates the provisions of the Act.  Moreover, he says the violation constitutes a "substantial failure to comply" with the provisions of the Act because it deprived him of the opportunity to have a jury comprised of citizens who: (1) are under 23 years of age; and/or (2) moved into this district between 1993 and 1996.

McGonagle's use of terms suggests that he is confusing the date on which the Plan Administrator received notification from the Southern District of New York that the data for the new master jury wheel (the "1993 data") had been "compiled" or "completed" (i.e., June 16, 1993) with the date on which the court actually "emptied and refilled" its master jury wheel

8

(August 1, 1993).  To support his argument, McGonagle notes that the Plan Administrator "used" the 1993 data in June of 1993 as the source for names of persons who were sent qualifying questionnaires (to compile a new qualified wheel).  Accordingly, he argues, the court's master jury wheel was necessarily "emptied and refilled" with the 1993 data in June of 1993, rather than on August 1, 1993.  The court disagrees.

The date on which the Plan Administrator first "used" the 1993 data to compose a list of people to be screened to determine whether they might properly be placed on a qualified jury wheel is not the date on which the master wheel was "emptied and refilled."  That "use" was administrative and preparatory in nature — necessary to the timely construction of a qualified wheel so it, like the master wheel, could be placed into service on August 1.  The critical date is the date on which the court's master jury wheel was actually <u>emptied</u> and subsequently <u>refilled</u> with the new 1993 data under the Plan.  That did not occur until August 1, 1993, when the court stopped using the 1989 data and began using information derived from the new 1993 data to actually select names for potential jury service in the district.  Prior to that date, the court used names derived from the master wheel prepared from 1989 data (based on the 1988 national election and then-current DMV data) to select jurors.  It is, therefore, entirely incorrect to conclude that the Plan Administrator "emptied and refilled" the master jury wheel at any

9

time prior to August 1, 1993.  To be sure, the Plan Administrator was _preparing_ to "empty and refill" before August 1, but that administrative activity was entirely consistent with the Act, the Act's purpose, and the Plan (and of course also served the district's obvious need to avoid any period of time during which jurors could not be selected because administrative tasks necessary to preparing the wheels remained unfinished).[3]

Accordingly, the Plan, both as written and as implemented in this case, fully complies with the requirements of the Act and properly provides for the "emptying and refilling of the master jury wheel at specified times, the interval for which shall not exceed four years."  28 U.S.C. § 1863(b)(4); (_See_ Appendix A attached hereto for a graphic depiction of the system's operation).  That four year interval runs from August 1 immediately following the national general election to July 31

---

By preparing both the master and qualified wheels _prior_ to August 1, the Plan Administrator is able to efficiently and effectively "empty and refill" _both_ the master and qualified wheels on that date.  If, as suggested by McGonagle, she had actually emptied and refilled the master wheel in June (_before_ she had prepared the qualified wheel), the court would not have been able to use that newly compiled data (in the form of a new qualified wheel).  Instead, it would have been compelled to continue to use the "old" qualified wheel until the new one could be compiled.  Alternatively, the court would have been forced to continue any scheduled jury selection until the new qualified wheel was ready for service.  The procedures prescribed by the Plan (and followed by the Plan Administrator) avoid those undesirable situations and allow the court to actually "use" the master jury wheel to select jurors as soon as it is emptied and refilled.  Those procedures also ensure that both the master wheel, and the qualified wheel derived from it, are emptied and refilled precisely every four years.

10

following the next national general election.  Put simply, defendant has not shown that the Plan Administrator neglected to empty and refill the master jury wheel in a timely fashion.  When citizens were selected, on July 24, 1997, to act as potential jurors in this case, the master jury wheel from which their names were derived had been in use for less than four years.

C.    "Substantial Failure to Comply."

McGonagle's motion also fails because, even if the court were to accept his claims and assume that due to some subtle error concerning the computation of time, the Plan as implemented in this case did not comply with the Act, McGonagle has not demonstrated that the alleged noncompliance was "substantial." As noted above, McGonagle argues that (because of the Plan's alleged deficiencies) he was unlawfully deprived of his right to have included in the potential jury pool people under the age of 23 and people who moved into this district between 1993 and 1996. He has not, however, demonstrated that any alleged deficiency in the Plan frustrated the random selection and cross section requirements of the Act.  See, e.g., United States v. Savides, 787 F.2d 751, 754 (1st Cir. 1986) ("Technical violations, or even a number of them, that do not frustrate the random selection and cross section requirements and do not result in discrimination and arbitrariness do not constitute a substantial failure to comply [with the Act]").

11

Before discussing the legal merits of defendant's claim, one factual inaccuracy contained in his pleadings should be noted and corrected. Contrary to defendant's assertion, all citizens between 18 and 23 years of age were <u>not</u> excluded from the pool of prospective jurors from which his petit jury was selected. Because this district constructs its master jury wheel from data collected from the Department of Motor Vehicles as well as the state's voter registration lists, the master wheel always includes (at the outset of its use) citizens who are 16 years old and older (i.e., the age at which New Hampshire citizens may obtain a drivers' license). As the master jury wheel ages and approaches the end of its 4-year lifespan, the pool of potential jurors includes people who are 20 years old and older (i.e., those who were 16 and older when the wheel was first put into service). Therefore, only otherwise qualified persons between the ages of 18 and 20 were unavailable for service on this petit jury, and only because no 14 or 15 year-olds were included in the master wheel when it was first put in service.

Turning to the merits of defendant's claims, it is apparent that he is not entitled to any relief. In <u>Savides</u>, <u>supra</u>, the court of appeals described the test to be applied in determining whether the "fair cross section" requirements of the Act have been violated:

> In order to demonstrate a violation of the statutory "fair cross section" standard, a defendant must show that a "distinctive" group, that is, a "cognizable"

12

> group, was excluded from the jury selection process;
> that such group was "systematically excluded"; and that
> because of such exclusion the jury pool failed to be
> "reasonably representative" of the community.

Id., at 754 (quoting United States v. Foxworth, 599 F.2d 1, 3 (1st Cir. 1979)).

Here, defendant essentially argues that the distinctive or cognizable groups that have been excluded from service on his jury are those people between the ages of 18 and 20 and those people who have moved to this district since 1993. However, neither group identified by defendant is legally "distinctive" or "cognizable." See generally Duren v. Missouri, 439 U.S. 357, 364 (1979). With regard to the group identified as those who recently moved to this district, defendant has failed to demonstrate that the race, ethnicity, religion, gender, or economic status of members of that group had any quantifiable impact upon the overall composition of the district's population or the potential jury pool. In fact, defendant has identified no unique or distinguishing feature of that group, other than that its members recently moved from somewhere else to this state. Indeed, defendant has not even shown that any significant immigration or significant emigration took place in the last four years. Accordingly, he has not shown that use of the district's master jury wheel substantially excluded, or discriminated in any way against, any identifiable group, and he has not shown that

13

use of that wheel yielded anything other than a jury pool which represented a fair cross section of the district's population.

Similarly, defendant has failed to demonstrate that persons between 18 and 20 years of age constitute a "cognizable" or "distinctive" group. See, e.g., Anaya v. Hansen, 781 F.2d 1, 3 (1st Cir. 1986) (holding that individuals between the ages of 18 and 24 do not belong to a "cognizable group"); Barber v. Ponte, 772 F.2d 982, 998 (1st Cir. 1985) (en banc) (habeas petitioner failed to demonstrate that individuals between the ages of 18 and 34 belong to a distinctive group). See also Johnson v. McCaughtry, 92 F.3d 585, 592-93 (7th Cir.) (petitioner failed to demonstrate that individuals between the ages of 18 and 25 belong to a distinctive group), cert. denied, 117 S.Ct. 596 (1996); Willis v. Kemp, 838 F.2d 1510, 1516 (11th Cir. 1988) (petitioner failed to establish that individuals between the ages of 18 and 29 constitute a distinctive group).

II.  Constitutional Implications.

Even if defendant had demonstrated that 18 and 19 year old citizens of New Hampshire and recent immigrants to this district constitute distinctive groups for "fair representation" purposes, he has not demonstrated that the overall character of the district's master jury wheel represented anything less than a random, fair, and reasonable cross section of the district's population.  Given the four year interval between "emptying and

14

refilling" the master jury wheel, some otherwise qualified persons will necessarily be excluded from potential jury service if they were not qualified to serve when the national general election occurred, since the master jury wheel was created from data as of that date (e.g., citizens who were 15 on election day, and 19 in the fourth year of the wheel's lifespan, are not included in the wheel). The temporary exclusion of that relatively small portion of the district's population from the master jury wheel is an unavoidable consequence of refilling the wheel every four years rather than every day, and, it is constitutionally permissible. As the Supreme Court recognized:

> Unless we were to require the daily refilling of the jury wheel, Congress may necessarily conclude that some periodic delay in updating the wheel is reasonable to permit the orderly administration of justice. Invariably of course, as time goes on, the jury wheel will be more and more out of date, especially near the end of the statutorily prescribed period for updating the wheel.

Hamling v. United States, 418 U.S. 87, 138 (1974). Here, defendant has not demonstrated that the inevitable aging of the jury wheel deprived him of any constitutionally protected right, and, has not shown that the wheel's age exceeded four years, the statutorily prescribed interval for updating the wheel's data. (Again, the wheel's life begins when it is "refilled," and ends when it is subsequently "emptied.")

15

III. Incomplete Juror Questionnaires.

Finally, McGonagle argues in passing that his ability to exercise fully informed challenges (both for cause and peremptorily) was prejudiced because some of the members of the potential jury pool returned incomplete juror questionnaires to the clerk's office. He also claims that he was prejudiced in some way because the juror questionnaire used in this case (i.e., one designed for use in cases in which the court might impanel an anonymous jury) differed from the questionnaire used in most other, non-anonymous jury cases in this district.

First, defendant has established no right to access any juror questionnaires. See, e.g., Jewell v. Arctic Enterprises, Inc., 801 F.2d 11, 13 (1st Cir. 1986) ("We do not think that the Jury Selection and Service Act grants counsel the right to inspect jury questionnaires solely to aid in the voir dire process"); United States v. Davenport, 824 F.2d 1511, 1515 (7th Cir. 1987) ("Those questionnaires contain prospective jurors' home addresses and other personal information. To give the defendant an absolute right of routine access to all materials would be an amendment of the Act. The defendant may be seeking those forms as an aid for voir dire examination purposes, but that is not the purpose of the questionnaires").

Second, when the minor differences in the questionnaires were brought to the court's attention (as the jury was about to

be selected), the court promptly extended to all counsel an opportunity to individually voir dire each potential juror with respect to potentially relevant information (mostly biographical) sought on the routine questionnaire but not sought on the questionnaire used in this case. It is difficult to understand what significant information defendant believes he had a right to obtain and could not have obtained by asking each juror an appropriate question. Because defendant had an adequate opportunity to review pertinent juror questionnaire information obtained by the court, and had an opportunity to conduct relevant individual voir dire, he was not prejudiced in any discernible way.

## Conclusion

Defendant has failed to demonstrate that the district's Plan violates the provisions of the Jury Selection and Service Act of 1968 as written or as implemented in this case. Moreover, even if the court were to assume that a violation of the four-year interval requirement occurred, defendant has failed to show that the violation was "substantial." See 28 U.S.C. § 1867(a).[4] Similarly, defendant has failed to demonstrate that the procedure employed by the court in impaneling this petit jury adversely

Because the court was concerned that potential jurors not have to wait while the court heard defendants' arguments in support of their challenge to the Plan, it scheduled the matter for a hearing at a later date and waived the requirement that defendants file their motion prior to jury selection (which ultimately proved unnecessary, as defendants were able to submit the motion immediately prior to the commencement of voir dire).

17

affected any of his constitutionally protected rights. Accordingly, defendant's motion to stay proceedings and dismiss jury panel (document no. 669) was denied.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

October 28, 1997

cc:   David A. Vicinanzo, Esq.
      Peter D. Anderson, Esq.
      Matthew J. Lahey, Esq.
      Bruce E. Kenna, Esq.
      Douglas J. Miller, Esq.
      Michael J. Iacopino, Esq.
      Bjorn R. Lange, Esq.
      David H. Bownes, Esq.
      Edward D. Philpot, Jr., Esq.
      United States Marshal
      United States Probation

## DISTRICT OF NEW HAMPSHIRE
## JURY SELECTION PROCESS

| Aug. 1<br>1989 | Nov. '92<br>Election | Aug. 1,<br>1993 | Nov. '96<br>Election | Aug. 1,<br>1997 | Nov. 2000<br>Election | July 31,<br>2001 |
|---|---|---|---|---|---|---|

| | Administrative<br>Preparation In<br>Advance of<br>Turnover Date<br>For Wheel #2:<br>•Gather Data<br>•Compile Master Wheel<br>•Mail Qualifying<br>  Questionnaires<br>•Compile Qualified<br>  Wheel<br>-------------------- | | Administrative<br>Preparation In<br>Advance of<br>Turnover Date<br>For Wheel #3:<br>•Gather Data<br>•Compile Master Wheel<br>•Mail Qualifying<br>  Questionnaires<br>•Compile Qualified<br>  Wheel<br>-------------------- | | Administrative<br>Preparation In<br>Advance of<br>Turnover Date<br>For Wheel #4:<br>•Gather Data<br>•Compile Master Wheel<br>•Mail Qualifying<br>  Questionnaires<br>•Compile Qualified<br>  Wheel<br>-------------------- |

"Empty[Wheel #1]&Refill[with Wheel #2]"
Master & Qualified Wheels

Begin Selecting Names Originating
From Master Wheel #2

"Empty[Wheel #2]&Refill[with Wheel #3]"
Master & Qualified Wheels

Begin Selecting Names Originating
From Master Wheel #3

| Use of Master/Qualified Wheel #1(<4 Years) | Use of Master/Qualified Wheel #2(<4 Years) | Use of Master/Qualified Wheel #3(<4 Years) |
|---|---|---|
| First 4 Year Interval | Second 4 Year Interval | Third 4 Year Interval |

19

APPENDIX A