UNITED STATES of America,
Plaintiff–Appellee,

v.

Louis DEFAZIO, Defendant–Appellant.[1]

No. 89–1953.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 27, 1989.
Decided April 9, 1990.

**1.** The defendant's name appears in the record both as "DeFazio" and "Defazio." We use "Defazio" because the record contains several of his signatures in that form.

Thomas M. Durkin, Asst. U.S. Atty., Collen D. Coughlin, Chicago, Ill., for plaintiff-appellee.

William Hedrick, Skokie, Ill., for defendant-appellant.

Before CUDAHY and POSNER, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

FAIRCHILD, Senior Circuit Judge.

The defendant appeals from his conviction under a multi-count indictment for filing a false income tax return, failing to file tax returns, attempting to evade income taxes, and bankruptcy fraud. The chief question is whether the district court compromised the defendant's sixth amendment right to counsel when it disqualified his chosen lawyer from representing him. The defendant also challenges (1) the exclusion of evidence allegedly bearing on his state of mind, (2) the admission of a communication from his attorney to him, (3) the giving of an "ostrich" instruction to the jury, and (4) his conviction of both tax evasion and failure to file a tax return for the same tax years.

## I.

Louis Defazio is a self-employed builder and developer of real estate. The Internal Revenue Service began an audit of Mr. Defazio's income tax liabilities in 1984. Mr. Defazio consulted an accountant, Carol Anderson, for advice about the audit, and Ms. Anderson accompanied Mr. Defazio to two meetings with an IRS agent to discuss Mr. Defazio's businesses and finances. The IRS audit continued through 1985. In the spring of 1986, the IRS referred Mr. Defazio's case to the United States Attorney's office for criminal prosecution. On June 6 of that year, Mr. Defazio filed a petition in bankruptcy under Chapter 11, and in July and August gave sworn testimony in three examinations in his bankruptcy case. The Chapter 11 petition was dismissed on October 7 on the motion of a creditor. In April of 1987, Mr. Defazio

filed a second bankruptcy petition, this time under Chapter 7. Mr. Defazio gave statements under oath in examinations in this case, also.

A grand jury indicted Mr. Defazio on September 16, 1987. A superseding indictment of eleven counts was filed August 24, 1988. Tax code violations were charged for the tax years 1981 through 1984, along with bankruptcy fraud charges based on Mr. Defazio's testimony at the examinations during two bankruptcy cases. More specifically:

As to tax year 1981, Count One charged Mr. Defazio with filing a return which he did not believe to be true and correct as to every material matter. 26 U.S.C. § 7206(1).

As to tax year 1982, Count Two charged an attempt to evade and defeat income tax by filing a false return and by other false statements and acts of concealment of assets. 26 U.S.C. § 7201.

As to tax year 1983, Count Three charged an attempt to evade and defeat income tax by failing to file a return and by false statements and acts of concealment. Count Four charged willful failure to file a tax return. 26 U.S.C. § 7203.

And for tax year 1984, Count Five similarly charged an attempt to evade and defeat income tax. Count Six charged willful failure to file.

Counts Seven, Eight, and Nine charged false declarations under oath in the 1986 bankruptcy case. Counts Ten and Eleven made similar charges regarding the 1987 case. 18 U.S.C. § 152.

The proof at trial showed the following:

For tax year 1981, Mr. Defazio's joint return had shown an adjusted gross income and taxable income of negative $24,085, and a tax of $0. The government proved he actually had an adjusted gross income of negative $20,247, taxable income (after deductions and exemptions which Mr. Defazio had not taken) of negative $38,628, and a tax of $0. (This is the reason why the government did not charge Mr. Defazio with attempting to evade taxes for that year.) What was significant, though, was

that Mr. Defazio's tax return had omitted interest income of $2,546, and gross income from four sources totalling $65,517. Income from these same sources was omitted from Mr. Defazio's 1982 return as well, and some of the false statements Mr. Defazio made in the bankruptcy cases tended to conceal his interest in these sources.

For tax year 1982, Mr. Defazio's joint return had shown an adjusted gross income of $1,050, taxable income of negative $949 and a tax of $0. The government proved he actually had an adjusted gross income of $94,229, taxable income of $75,369, and a tax of $25,236. Interest received but omitted was $29,248. The 1982 gross income from the other sources omitted from the 1981 and 1982 returns was $95,181.

As to 1983, Mr. Defazio did not file a return, although he did obtain an extension of time to file, and in applying for the extension had estimated his tax at $15,000 and paid that amount. The government proved an adjusted gross income (assuming a joint return) of $121,476, taxable income of $95,067, and a tax liability of $63,152 (of which Mr. Defazio had paid $15,000). Unreported interest was $18,952. The gross income from the other sources omitted from the earlier returns totalled $179,052.

As to 1984, Mr. Defazio filed no return. The government proved an adjusted gross income (assuming a joint return) of $61,796, taxable income of $58,877, and a tax of $14,741. Interest received was $15,118. The gross income from other sources omitted from the earlier returns totalled $28,086.

As to the bankruptcy fraud charges, the evidence showed that Mr. Defazio gave evasive, misleading, and untrue answers to questions concerning his ownership of assets at examinations during his two bankruptcy proceedings.

The jury found Mr. Defazio guilty on all counts, and the district court entered judgment according to the verdict. He was sentenced to concurrent three year terms of imprisonment on Counts One, Two, and Three, followed by five years of probation

on Counts Four through Eleven, probation being conditioned on his honoring all future tax obligations, filing and paying all back taxes due, paying the costs of prosecution ($7,548.24) and paying a $10,000 fine on each of Counts Two and Three.

## II.

The Sixth Amendment guarantees a criminal defendant the right to counsel and, within limits, the right to counsel of the defendant's own choosing. *Wheat v. United States*, 486 U.S. 153, 158–59, 108 S.Ct. 1692, 1696–1697, 100 L.Ed.2d 140 (1988). Disqualification of chosen counsel can have severe consequences, especially when the representation has already begun. The defendant starts with a presumption favoring his or her right to chosen counsel. The government can defeat this presumption by showing that representation by the chosen counsel poses either an actual conflict of interest, or a serious potential for such a conflict. *Id.* at 164, 108 S.Ct. at 1699. Although judges should hesitate before granting disqualification, "[t]he evaluation of the facts and circumstances of each case … must be left primarily to the informed judgment of the trial court." *Id.* Therefore, we review a district court's decision to disqualify defense counsel only for abuse of discretion. *United States v. Micke*, 859 F.2d 473, 481 (7th Cir.1988). Underlying factual determinations relied on by the district court to support its decision to disqualify are reviewed under the clearly erroneous standard. *United States v. O'Malley*, 786 F.2d 786, 792 (7th Cir.1986).

At Mr. Defazio's arraignment on the initial indictment, on September 23, 1987, Nicholas Spina appeared on behalf of the defendant. Two other attorneys previously retained by the defendant were also there, and asked permission to withdraw. The prosecutor informed the court that Mr. Spina had represented Mr. Defazio in bankruptcy and was present at the time Mr. Defazio was examined. Responding to questions from the court, she said she did not believe that Mr. Spina would be needed as a witness, apparently because Mr. Defazio's testimony had been transcribed and could readily be proved. She made no objection to Mr. Spina's appearance "if there is no problem" and indicated that she then knew of no problem. The court permitted Mr. Spina to proceed as counsel for Mr. Defazio.

Ten months later, the government filed a motion to disqualify Mr. Spina. In its motion, the government asserted that in 1985 Mr. Defazio sought counsel from Mr. Spina on how to avoid a foreclosure sale at what Mr. Defazio considered an unfair price. Mr. Spina advised him to see an attorney named Barry Yacker, a bankruptcy specialist, who then represented Mr. Defazio in his 1986 Chapter 11 case. The government asserted that Mr. Yacker had obtained Defazio's signature in blank on the Chapter 11 petitions, filled them in and filed them without reviewing their contents with Mr. Defazio.[2] The government claimed that substantial assets were not disclosed in the petition, and that its evidence would show that during every examination under oath in that proceeding, Mr. Defazio lied. The government's motion noted that the Chapter 11 proceeding was dismissed on a judgment creditor's motion, and continued as follows:

the evidence will show that on May 15, 1987, with now-defense counsel Nicholas Spina acting as his attorney, Defazio filed for personal bankruptcy under Chapter 7 of Title 11. On these second petitions, presumably prepared by Nicholas Spina on the basis of information provided by Defazio, Defazio essentially denied having any assets, stating he lived on handouts from his wife and children. The government's evidence will show these representations were false. At the succeeding examinations under oath by [creditors], Defazio was represented by Spina. The evidence will show that he again lied in answers to questions about vehicles and boats, real estate,

---

**2.** Apparently these facts led the government to drop two counts of the original indictment, charging the filing in 1986 of a false bankruptcy schedule and a false statement of financial affairs. The superseding indictment was filed one month after the motion to disqualify Mr. Spina.

stock transfers, bank accounts and sources of income....

... it is apparent that Attorney Nicholas Spina participated in essential contested events and is likely to be a material witness in this case. If Defazio invokes the defense of advice of counsel, as he has done with respect to the Chapter 11 filing, then Spina is either a witness for Defazio or a witness for the government against Defazio.

The defendant's response, prepared by Mr. Spina, was somewhat equivocal. It acknowledged that Mr. Spina had referred the defendant to Mr. Yacker, and had later represented the defendant in his Chapter 7 case. The response asserted, though, apparently as a reason against disqualification, that Mr. Spina "is also in a unique position to comment upon the actual proceeding, the actual questions and answers elicited during the proceedings...."

The response made no estimate of the probability of Mr. Spina being a witness. It did argue that "[e]ven though Attorney Spina has had conversations with the government concerning the potentially acting [sic] as a witness or not, the mere fact that he may be called as a witness should not deter or be utilized as a means by which to disqualify him as Defendant's counsel." The response then noted the extensive preparation Mr. Spina had performed, his awareness of the evidence likely to be offered, and the resulting advantage to his client. It went on to concede that no attorney "should act as a witness against his own client." Concluding, the response reasserted that the defendant preferred to have Mr. Spina represent him, but conceded that the "Court is in a better position to weigh the interests of all parties concerned and rule accordingly."

■ Judge Kocoras granted the motion to disqualify without hearing evidence or oral argument, giving his reasons orally at a status conference. He noted the government's claim that the papers filed in the Chapter 7 case were false and Mr. Spina's assertion that he prepared the schedule based on information Mr. Defazio supplied. Judge Kocoras inferred a strong possibility

that the government might want to call Mr. Spina to show that the information as filed came from the defendant. The judge interpreted the assertion that Mr. Spina "is in a unique position to comment upon the actual questions and answers elicited" as an indication that Mr. Spina was a probable witness and perhaps an essential one. Judge Kocoras suggested that if Mr. Spina tried the case, the jury would wonder why, if he was a participant in the bankruptcy, he wasn't telling the jury about it directly, rather than through witnesses.

If the defendant was arguing before the district court that a party's attorney could properly be a witness in favor of his client on a disputed matter, he was mistaken, absent extreme circumstances. See Model Code of Professional Responsibility DR 5–102(A) & (B); DR 5–101(B)(4); Model Rules of Professional Conduct Rule 3.7(a). We needn't decide if such circumstances existed, since the defendant does not argue on appeal that Mr. Spina could have both acted as his counsel at trial and testified. He argues instead that any unsworn witness problem could have been solved without disqualification, that Judge Kocoras was mistaken in his assessment of the likelihood that Mr. Spina would become a material witness, that the judge should have considered measures less drastic than disqualification, and at the very least, that he should have held a hearing before disqualifying the defendant's chosen attorney.

The defendant's response conceded in general the existence of an "unsworn witness" problem, saying that "an attorney's failure to testify regarding matters of which the jury was aware he had intimate knowledge of could create an improper inference in the juror's minds." We are not aware of any facts in this case which would have made it necessary at trial (in the absence of an advice of counsel defense) for the jury to be told that Mr. Spina acted as Mr. Defazio's counsel in his Chapter 7 proceeding. We agree that if the problem were limited to the jury's knowledge that Mr. Spina had acted as Mr. Defazio's counsel in filing his Chapter 7 papers, and was present as counsel at the subsequent exam-

inations, redaction would have solved it. *United States v. Diozzi*, 807 F.2d 10, 14 n. 8 (1st Cir.1986). See *United States v. Levine*, 794 F.2d 1203, 1206–07 (7th Cir.1986).

More compelling, and harder to address without disqualification, was the problem posed by the possibility of Mr. Spina becoming a *sworn* witness, testifying either to what advice he gave Mr. Defazio, or what he knew about Mr. Defazio's state of mind during the Chapter 7 examinations. The parties agree that the likelihood of Mr. Spina becoming a material witness turned on whether Mr. Defazio defended any of the charges based upon the advice given him by Mr. Spina during the Chapter 7 representation. (Indeed, it seems the only way Mr. Spina could have testified concerning privileged communications would be if Mr. Defazio waived his attorney-client privilege by raising an advice of counsel defense.)

Such a defense might pit Mr. Spina's word against his client's. Or, it might discourage spirited advocacy, since an attorney has a personal and professional interest in not having a client claim the attorney advised lying under oath. Also, the justice system has an interest in not having a defense attorney be both advocate and witness regarding material issues. See, *e.g.,* Model Rules of Professional Conduct, Rule 3.7 Comment. The district court has discretion to refuse a defendant's proposed waiver of conflict of interest, if the waiver will not protect other interests threatened by the defendant's lawyer testifying. *O'Malley*, 786 F.2d at 790–92. See *Wheat*, 486 U.S. at 160, 108 S.Ct. at 1697.

At the time Judge Kocoras disqualified Mr. Spina, how likely was it that Mr. Defazio would raise an advice of counsel defense? Of course, as it turned out, Mr. Defazio did not raise the defense at trial, and Mr. Spina did not testify.[3] But this is unimportant, since we do not review the district court's decision with the advantage of hindsight. See *Wheat*, 486 U.S. at 162–

63, 108 S.Ct. at 1698–99. The defendant did have Mr. Spina under subpoena during trial, though, which helps corroborate the trial judge's conclusion that his becoming a defense witness was a strong possibility.

There is no question that Mr. Defazio *might* have asserted at least a partial defense based upon the content of Mr. Spina's Chapter 7 guidance. As the defendant conceded, Mr. Spina was consulted "relative to numerous and various judgments and other financial matters engendered by the dismissal of [the defendant's] Chapter 11 proceeding," he prepared Mr. Defazio's Chapter 7 bankruptcy petitions, and he prepared certain schedules "based upon information supplied by this defendant." Mr. Spina was present as Mr. Defazio's lawyer at the Chapter 7 examinations during which Mr. Defazio allegedly lied about his finances.

It is reasonable to infer, given Mr. Spina's prior representation of the defendant, that he was familiar with the subjects of Mr. Defazio's testimony at his Chapter 7 examinations (and perhaps had reviewed the content of his testimony in the Chapter 11 case), and may have prepared him for the Chapter 7 examinations. And, while the Chapter 7 filings prepared by Mr. Spina were not the subject of any charge against Mr. Defazio, the government did claim they contained false statements, and they might well have been relevant and admissible at trial to show, for example, their effect upon Mr. Defazio's oral testimony, or whether he intended to mislead his examiners.

Only Mr. Spina and the defendant knew whether Mr. Spina's prior advice could support an advice of counsel defense, and whether the defendant planned to raise it. The only guidance the defendant gave Judge Kocoras in deciding the disqualification issue was the defendant's response to the government's motion to disqualify. This surely gave Judge Kocoras little comfort that Mr. Spina would not be taking the

---

**3.** Mr. Defazio called only one witness (although he attempted to call the accountant, Mr. Panno). His defense, such as it was, consisted of contesting whether the government had proved that he *willfully* failed to file returns and attempted to evade taxes, and that he had the *intent* to defraud during the bankruptcy examinations.

stand at trial. Not only did the response suggest that it was permissible for Mr. Spina to testify while still representing Mr. Defazio, it asserted that Mr. Spina should be allowed to represent the defendant *because* he was in a "unique position to comment upon the actual questions and answers elicited" in the Chapter 7 proceedings. Perhaps this statement was a clumsy attempt to argue that Mr. Spina's prior work with Mr. Defazio made him an especially valuable attorney (a point made separately elsewhere in the response), but we cannot fault Judge Kocoras for reading it differently.

Mr. Defazio relies heavily on *United States v. Diozzi*, 807 F.2d 10 (1st Cir.1986), but the facts of that case are sufficiently different to warrant a different outcome. There, six days before the defendants' scheduled trial on income tax evasion, the government moved to disqualify both defense attorneys, claiming it intended to call them as material witnesses. The two lawyers had serially represented the defendants during their IRS investigation, and had each hired accountants to prepare memoranda of the defendants' finances, reviewed them with the defendants, and filed them with the IRS and Justice Department. The government, arguing for disqualification, claimed that it needed the lawyers' testimony as the "best evidence" to prove the contents of the defendants' statements, made through counsel via these financial memoranda. The lawyers were disqualified, testified at trial, and the defendants were convicted. The First Circuit reversed, because there was no pressing need for the lawyers' testimony to prove the content of the defendants' statements to the IRS and Justice Department. The defense offered stipulations which the court felt were equally valuable to the government, so it was unnecessary and improper to disqualify the attorneys simply to have live witnesses. *Id.* at 13–14. In this case, by contrast, if an advice of counsel defense was raised, the content of Mr. Spina's testimony was not available through sources other than himself—the parties could hard-

ly have stipulated to what Mr. Spina knew about Mr. Defazio's state of mind, or what advice he gave the defendant, since that knowledge was only in the ken of Mr. Spina and the defendant.

■ Nor do we think it was reversible error for Judge Kocoras not to hold an evidentiary hearing to decide the disqualification issue. There were no material issues of historic fact to be determined, only the question whether the defendant would raise an advice of counsel defense—which easily could have been addressed by memorandum. *Cf. O'Malley*, 786 F.2d at 793 (hearing on attorney disqualification not constitutionally necessary, but may be advisable). We do think, however, it would have been better practice for the court to have conducted at least a colloquy with counsel to clarify the positions of the parties before reaching a decision. Such a discussion might have developed any number of predicates for making for a more informed decision, such as the probability of an advice of counsel defense or other need for Mr. Spina's testimony, or the effectiveness of redacting Mr. Spina's name from relevant exhibits, a limited disqualification,[4] or other less drastic alternatives to address the conflict problem. However, as the defendant did not suggest any such alternatives, Judge Kocoras did not err by not considering them *sua sponte*. *Diozzi*, 807 F.2d at 14 n. 8. The district court did not abuse its discretion in disqualifying Mr. Defazio's chosen counsel.

### III.

■ The defendant next complains of the exclusion of the testimony of an accountant, Frank Panno, and hypothetical income tax returns prepared by him for tax years 1981 through 1984.

Defense counsel claimed at trial that there was evidence in the record that Mr. Defazio believed that the law permitted him to carry losses forward. Although all parties now agree that he was not legally in a position to do that, defense counsel sought to show, through Mr. Panno and his

---

**4.** See *United States v. Cunningham*, 672 F.2d 1064, 1075 (2d Cir.1982).

demonstrative tax returns, what the effect of the carrying forward of Mr. Defazio's 1981 overall loss (and also, apparently, depreciation not claimed before) would have had on his tax liability, if the law did permit the carrying forward. The defendant contended that such proof would bear upon the question whether he was willful in failing to file, or in attempting to evade the tax.

Judge Kocoras excluded Mr. Panno's testimony and the demonstrative returns, concluding that there was no evidence of Mr. Defazio's good faith belief in the right to carry forward losses. Defense counsel then made an offer of proof which included the demonstrative returns and some work papers, but not Mr. Panno's testimony. The demonstrative returns show a tax liability for 1981 of $0 (as the government also proved) and an overall loss for that year of $43,235. The 1982 return shows this 1981 loss carried forward, resulting in a tax of $2,355 for that year (compared to the tax liability of $25,236 proved by the government). The 1983 return shows a tax liability of $47,157, and the one for 1984 no tax due (compared to the government's proof of a joint $14,741 tax liability), and an overall loss of $75,833.

The evidence supporting Mr. Defazio's belief in his ability to legally carry forward losses is equivocal, at best. When in 1984 he became aware that his 1981 return was being audited, he consulted an accountant, Ms. Anderson. According to her testimony at trial, she advised Mr. Defazio to file amended returns for 1981 and 1982, and helped him apply for an extension for 1983. She worked with him for about a year, was unable to persuade him to bring in adequate records, and ultimately advised him to take his problems to an attorney. She prepared no returns for him.

She testified to an April 4, 1984 conversation with Mr. Defazio concerning his planned 1983 return. Mr. Defazio told her he had sold bank stock for $500,000, but said he had losses to offset the gains he realized. He wrote out a rough memorandum which is in the record. It indicated he had purchased stock in Apron String Res-taurant I for $105,000 in 1976 and in Apron String Restaurant II for $80,000 in 1978 to 1981. He had told Ms. Anderson the stock was "defunct" and the loss had never been claimed. The memorandum noted a loss of $185,000. It then noted the difference between the sale price and purchase price of bank stock and computed a long term capital gain of $111,850.

At trial Ms. Anderson was shown Mr. Defazio's 1978 return on which a loss of $187,738.58 had been taken on the Apron Strings Restaurant. Her testimony made it clear that she had understood Mr. Defazio as telling her about a loss he suffered within 1983. The defense would analyze the evidence as showing that Mr. Defazio had experienced a loss in 1978, had forgotten that he had taken the tax benefit of it in 1978, and that his assertion to Ms. Anderson that he could offset the loss against gain in 1983 must mean he believed that a loss realized but not taken in one year can be taken in a later year. On the other hand, if he had really forgotten that he had determined the stock to be worthless in 1978, his assertion that it was worthless in 1983 would not tend to prove a belief that a loss experienced in one year could be claimed in a later year. We think Judge Kocoras' rejection of the Panno testimony and demonstrative returns can be sustained on the reason he gave.

In any event there is another reason why this evidence was not shown to be admissible. The demonstrative returns were based in large part on figures produced by an accounting firm which worked on Mr. Defazio's records in 1987 and 1988, after he was indicted, and in part on Mr. Panno's computations. There is nothing to show that at the time the 1981–1984 returns were due, years before, Mr. Defazio had in mind those figures or ones similar to them when deciding what, if any, returns he would file. And there was certainly no evidence at all that Mr. Defazio believed he could omit *depreciation* in one year and claim it in a later one.

Moreover, if there were any error, it was harmless. The record shows that the proof of deception and concealment is over-

whelming, and the absence of the demonstrative returns did not have a substantial influence on the jury's view of Mr. Defazio's guilt. See, *e.g.*, *United States v. Hill*, 898 F.2d 72, 75 (7th Cir.1990).

■ The defendant also objects to the exclusion of portions of his testimony given in examinations in the 1986 Chapter 11 proceeding. The government offered excerpts from these proceedings to prove the substance of Mr. Defazio's allegedly false statements, and the court admitted them. The defense offered other excerpts, not in explanation or qualification of the content of the government's submissions, but as proof of the defendant's prevailing state of mind during the proceedings. In these excerpts, Mr. Defazio refers to and explains his side of a running dispute he had with a creditor, Summit First Federal.

Summit had a mortgage on a building on which Mr. Defazio was a guarantor. Summit had foreclosed, and the property had been sold for a price Mr. Defazio contended was grossly unfair. The sale had been confirmed and a substantial deficiency judgment entered against Mr. Defazio. In the proffered excerpts, Mr. Defazio testified at length about various appraisals of the property, and of his view of the unfairness of the confirmation of the sale and resulting deficiency. He said "I figured my only recourse and salvation is to come and file a Chapter 11 in order to protect myself." He also said "I've got enough equity in these properties to take care of everybody concerned, including Summit First Federal."

In this court, Mr. Defazio argues that the testimony "undercut the contention that he spoke with a fraudulent intent to conceal.... Hence it could have been argued that Defendant was not purposely engaging in a concealment to defeat the bankruptcy laws, but rather that he was being combative in his answers as a result of his continuing struggle with Summit First Federal."

Yet, Mr. Defazio's dispute with Summit First Federal does not excuse lying during his bankruptcy examinations; the merits of his fight with a creditor are irrelevant to whether his false declarations were fraudulent. Even if Mr. Defazio's "combative" attitude at the bankruptcy proceedings had some marginal relevance to his intent to defraud, our review of the offered testimony leads us to agree with the district court that the probative value of these statements was far outweighed by their potential to confuse the jury with the facts of a collateral dispute. Fed. Rule Evid. 403. There was no abuse of discretion.

## IV.

Some of the tax evasion charges against Mr. Defazio were based in part on his sudden transfer, for nominal consideration, of various personally held assets (such as a house in Florida) into a newly-created corporation called Defazio, Inc. To prove that these transfers were part of Mr. Defazio's willful attempt to evade income taxes, the government called Attorney Silets, who had represented Mr. Defazio in connection with the IRS's audit. The purpose was to show that the transfers of assets followed closely upon Mr. Defazio's learning he would likely be facing criminal tax evasion charges. At trial, Mr. Silets identified and read to the jury a memorandum his partner had sent him. The memo said that an IRS agent had called for Mr. Silets "to tell you that they [the IRS] had completed their investigation and are ready to refer the case [for prosecution] and that if you have any defenses you would like to present, he would be glad to listen to them." Mr. Silets testified that he initially met with the IRS agent without Mr. Defazio, and learned firsthand of the IRS's recommendation of prosecution. (The record is silent as to what he presented.) He testified that after the meeting, he tried unsuccessfully to call Mr. Defazio, sent him a letter informing him of the meeting with the IRS, and later met with him in person. At that time, he gave Mr. Defazio a memorandum summarizing his meeting with the IRS. The defendant argues that the substance of this testimony was protected by his attorney-client privilege, and should not have been admitted.

■ The attorney-client privilege normally shields only confidential communications from client to attorney. Communications from attorney to client are privileged only if they constitute legal advice, or tend directly or indirectly to reveal the substance of a client confidence. *In re Sealed Case*, 737 F.2d 94, 99 (D.C.Cir.1984); *Matter of Fischel*, 557 F.2d 209, 211 (9th Cir.1977); *Schenet v. Anderson*, 678 F.Supp. 1280, 1281–82 (E.D.Mich.1988).

■ Mr. Silets testified only to what the IRS agent said to him, and that he later relayed those statements to Mr. Defazio. The content of this testimony is unprivileged because it did not reveal, either directly or implicitly, legal advice given Mr. Defazio or any client confidences. *United States v. Gray*, 876 F.2d 1411, 1415–16 (9th Cir.1989) (Attorney's notification to client of sentencing hearing date was not privileged); *United States v. Clemons*, 676 F.2d 124, 125 (5th Cir. Unit B 1982) (Attorney's message to client regarding trial date not privileged). Admitting Mr. Silets' testimony did not violate the defendant's attorney-client privilege.

The defendant goes further, though, focusing upon the part of the memorandum recounting the IRS agent's invitation to present defenses. He argues that it conveyed to the jury the impression, contrary to the burden placed on the government to prove guilt, that it was incumbent upon him to present defenses to the government's accusations of wrongdoing.

■ When the memorandum was read at trial, defendant's trial counsel objected to the portion relating to the presentation of defenses. At a sidebar, Judge Kocoras said he also had some question about that sentence in the memorandum, and that he could have it stricken, but felt that would just "highlight" the reference. The government suggested redaction of the memorandum were it sent to the jury room. It was apparently agreed that in any further reading, the reference to defenses would be omitted. Defense counsel did not make a motion to strike, and there was no further reference before the jury to the invitation to present defenses. The impact of the brief statement was therefore minimized. Furthermore, the jury was instructed by the court that the defendant is presumed innocent, that the government has the burden of proving guilt beyond a reasonable doubt, and that "the defendant is not required to prove his innocence or produce evidence." We are unpersuaded that a single reference during trial to the defendant's opportunity to present defenses to an IRS agent could have had any influence on the jury's understanding of the government's burden of proof.

### V.

■ When instructing the jury, the district court first defined the term "knowingly," saying that "it means that the defendant realized what he was doing and was aware of the nature of his conduct and did not act through ignorance, mistake or accident. Knowledge may be proven by defendant's conduct and by all the facts and circumstances surrounding the case." He then said

> You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut his eyes for fear of what he would learn, you may conclude that he acted knowingly, as I have used the word.

This "ostrich" instruction came verbatim from *United States v. Ramsey*, 785 F.2d 184, 190–91 (7th. Cir.), *cert. denied*, 476 U.S. 1186, 106 S.Ct. 2924, 91 L.Ed.2d 552 (1986).

*Ramsey* approves the use of this instruction in cases where it is provident not to leave the matter to argument. *Id.* at 191. In deciding to give the instruction, Judge Kocoras referred to Mr. Defazio's evidently disorganized records, and indicated his view that Mr. Defazio could not close his eyes to what his records would disclose if they were organized. From our own examination of the testimony, we gather that Mr. Defazio possessed the relevant original records of his transactions. He resisted bringing them together, or giving them to

Ms. Anderson, to determine his tax obligations. The jury could well infer that he feared what they would show. The case relied on by Mr. Defazio, *United States v. Beckett*, 724 F.2d 855 (9th Cir.1984), is easily distinguished: unlike this case, there was no evidence in *Beckett* that the defendant was deliberately remaining ignorant in the face of his own suspicions. The evidence was consistent only with the defendant's innocent ignorance or his actual knowledge of the criminal activity. *Id.* at 856. We find no abuse of discretion in deciding this was an appropriate case for the ostrich instruction.

*Ramsey* forecloses the defendant's other two arguments regarding this instruction. While the ostrich instruction is not a favorite of the law, its use is not limited to cases where a defendant is associated with a group of others involved in criminal activity. "If a person with a lurking suspicion goes on as before and avoids further knowledge, this may support an inference that he has deduced the truth and is simply trying to avoid giving the appearance (and incurring the consequences) of knowledge." *Ramsey*, 785 F.2d at 189. Nor do we accept the defendant's argument that the instruction improperly imposed a negligence standard on a specific intent crime. We have already approved this instruction in a prosecution involving a crime which requires guilty knowledge. See *Ramsey*, 785 F.2d at 190. Moreover, other instructions adequately protected Mr. Defazio from being convicted for negligently failing to realize his income tax responsibilities: the jury was told that a person harboring a reasonable, good faith belief that no taxes were owed could not be found guilty of intent to evade taxes,[5] and was provided with several offense-specific definitions of willfulness, each of which pointedly distinguished between knowledge on one hand, and accident, inadvertence, or negligence on the other.

### VI.

■ Finally, Mr. Defazio claims that the offense of failure to file a tax return (26 U.S.C. § 7203) is included within the broader offense of tax evasion (26 U.S.C. § 7201), so it was improper for the district court to enter judgment of conviction and impose cumulative penalties on both offenses for the same tax years. This argument was foreclosed in this circuit by *United States v. Foster*, 789 F.2d 457, 460 (7th Cir.1985), *cert. denied*, 479 U.S. 883, 107 S.Ct. 273, 93 L.Ed.2d 249 (1986). Accord, *United States v. Davenport*, 824 F.2d 1511, 1519 (7th Cir.1987); *United States v. Buckner*, 830 F.2d 102, 104 (7th Cir.1987). The Supreme Court's recent opinion in *Schmuck v. United States*, —— U.S. ——, 109 S.Ct. 1443, 1450, 103 L.Ed.2d 734 (1989) confirms the propriety of comparing the elements of each crime, as we did in *Foster* and *Davenport*, to define lesser included offenses.

### VII.

The judgment appealed from is AFFIRMED.

---

**5.** We note, in passing, that the Supreme Court has recently decided to review this court's decision in *United States v. Cheek*, 882 F.2d 1263, 1267 (7th Cir.1989), *cert. granted*, —— U.S. ——, 110 S.Ct. 1108, 107 L.Ed.2d 1016 (1990), that a good faith, but objectively unreasonable, misunderstanding of the tax law is no defense to charges of tax evasion.