UNITED STATES of America,
Plaintiff–Appellee,
Cross–Appellant,

v.

Gregory Scott BIGELOW, Vincent Lima, and Anthony W. Vaughan, Defendants–Appellants, Cross–Appellees.

Nos. 89–2274, 89–2292, 89–2293, 89–2294.

United States Court of Appeals,
Seventh Circuit.

Argued April 12, 1990.

Decided Sept. 28, 1990.

Rehearing and Rehearing En Banc Denied Oct. 30, 1990.

Thomas M. Durkin, Stephanie Uhlarik, Joshua T. Buchman, Asst. U.S. Atty., Office of the U.S. Atty., Chicago, Ill., for plaintiff-appellee, cross-appellant.

Joshua Sachs, Frederick F. Cohn, John A. Meyer, Chicago, Ill., Carl P. Clavelli, Schiller Park, Ill., Michael J. Coggin, Oak Park, Ill., for defendants-appellants, cross-appellees in No. 89–2274.

Raymond D. Pijon, Joshua Sachs, Frederick F. Cohn, Chicago, Ill., for defendants-appellants, cross-appellees in No. 89–2292.

Frederick F. Cohn, Chicago, Ill., for defendants-appellants, cross-appellees in No. 89–2293.

Carl P. Clavelli, Schiller Park, Ill., for defendants-appellants, cross-appellees in No. 89–2294.

Before BAUER, Chief Judge,
CUMMINGS and WOOD, Circuit Judges.

BAUER, Chief Judge.

Carl Sandburg once described Chicago as "Hog Butcher for the World,/ . . . Stormy, husky, brawling,/City of the Big Shoulders." [1] This case combines these elements with unfortunate results. Vincent L. Lima, a wholesale meat distributor, hired two rather large gentlemen, Anthony W. Vaughan and Gregory Scott Bigelow, to collect debts owed to Lima's company. The strong-arm tactics employed by these collectors led to convictions of all three men for conspiracy to participate and the knowing participation in the use of extortionate means to collect extensions of credit, in violation of 18 U.S.C. § 894. All three defendants have appealed their convictions. In addition, the government has appealed the district court's downward departures from the penalties established under the Sentencing Guidelines. We affirm the convictions of Lima, Bigelow and Vaughan. We vacate the defendants' sentences as given, however, and remand for resentencing by the district court consistent with the Guidelines and this opinion.

## I. The Facts

Vincent L. Lima is the owner of M & V Provisions ("M & V"), a wholesale meat distributor, in Chicago, Illinois. Lima sells large quantities of meat to retail operations, frequently on credit. M & V has ten employees, but Lima himself handles the collections on large accounts.

On April 14, 1988, Anthony W. Vaughan and Gregory Scott Bigelow were walking around the wholesale meat dealers' business district, drumming up business for their new enterprise: "Crash Course Collections, Inc." Vaughan, who stands between 6′6″ and 6′8″ feet tall and is relatively husky, and Bigelow, two inches shorter and slightly thinner, were visiting distributors and handing out business cards. The cards stated simply, "We guarantee results." It gave just their first names, "Tony" and "Scott," and a beeper number. In a final burst of subtlety, Vaughan and Bigelow added a drawing of a funeral wreath. At M & V, they talked with Lima's son, Larry, who took one of the cards and passed it along to his father.

Vincent Lima subsequently hired Vaughan and Bigelow to collect on one of his troubled accounts, James Lekkas of Chicago Gyros & Produce. Lekkas owed Lima and M & V approximately $5,000. The account had been outstanding since the fall of 1987. Lekkas had twice bounced checks for his account with Lima and was now apparently hiding from Lima. On April 18, Vaughan and Bigelow confronted Lekkas outside a produce store and demanded that he pay his debt to Lima. When Lekkas claimed that he did not have enough money to pay his bill, Vaughan and Bigelow threatened him and tried to push him inside their car. Breaking free, Lekkas ran inside a nearby store where onlookers had called the police. Vaughan and Bigelow jumped in their car and fled before the police arrived.

Later, Lekkas called Lima and described his treatment by these newly-hired collectors. Lima responded that the matter was out of his hands and that Lekkas would have to deal with the collectors now. Indeed he would: Lekkas continued to receive threatening phone calls from Vaughan informing him to pay the money he owed Lima and that "we know where you live." Two weeks after the incident,

---

1. Carl Sandburg, "Chicago," *reprinted in The* *New Oxford Book of American Verse* 422 (1976).

Lekkas sent an initial payment of $500 to Lima.

After the successful Lekkas collection, Lima gave additional business to Crash Course Collections, Inc. Vaughan and Bigelow were asked to collect from William Burks of Rib King in Dolton, Illinois. Burks had taken delivery of six or seven shipments of meat worth $23,000 on credit, from May to October 1987. Despite several inquiries by Lima and Burks' repeated promises to pay, the debt was never satisfied. Burks had written several bad checks to Lima, and was obviously a source of continuing frustration.

On May 6, 1988, Vaughan and Bigelow appeared at Burks' home at 7:30 in the morning. Burks' thirteen year-old son, John, answered the door and the collectors asked for his father. Burks came downstairs and met Vaughan and Bigelow at the door. They suggested that Burks invite them inside. Burks refused. At this point, all hell broke loose.

Vaughan and Bigelow tried to push past the 270–pound Burks and into his house. When Burks pushed back, Bigelow punched him in the face, knocking Burks to the ground and ripping a hole in his lip. John Burks, having seen the punch, ran into the next room to call the police. Bigelow chased him, shoved him into the couch, and tore the phone from the wall. Mrs. Burks, hearing the commotion, came running downstairs from the second floor and asked what was happening. She was told to "shut the fuck up." Vaughan and Bigelow asked Burks if he knew Vince (Lima) from M & V. Burks admitted he did. The men told Burks to "come up with $10,000 by Sunday, $3,000 a week after that, or you're dead." Vaughan and Bigelow then left the house. Burks immediately called Lima and informed him of the attack. Lima responded simply, "pay up."

Burks decided to take the story of his assault to a more sympathetic listener: the FBI. After hearing Burks' story, an agent placed a recorder on Burks' home phone. Over the next several days, agents monitored and recorded a series of calls between Burks and Lima, and Burks,

Vaughan and Bigelow, in which the defendants repeatedly threatened Burks and his family if he failed to pay his debt to Lima and M & V. On May 10, 1988, Vaughan and Lima were arrested. Bigelow, after promising to surrender himself to FBI agents on May 23, 1988, fled Chicago and was eventually found in California. He was returned to Chicago were he was arrested and charged.

Lima, Bigelow and Vaughan were each charged in a nine-count indictment with conspiracy to participate and knowing participation in the use of extortionate means to attempt to collect extensions of credit, in violation of 18 U.S.C. § 894. Following a jury trial before Judge Nordberg from January 23 to February 3, 1989, Lima was found guilty on seven counts, Bigelow on eight counts and Vaughan on all nine. On May 18, 1989, Judge Nordberg sentenced Lima to four weekends in custody, four years probation, four hundred hours of community service and a fine of $5,719.33. Bigelow received a 24–month sentence, to be followed by three years probation. Vaughan was given a 15–month sentence and three years probation. Each of the defendants now appeals his conviction. In addition, the government has appealed the sentences imposed by the district court. We will consider each of the issues raised in turn.

## II. Lima: The Ostrich Instruction

In his charge to the jury, Judge Nordberg gave the following instruction on the issue of Lima's knowledge:

> You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed, or that someone has withheld some important facts, yet shut his eyes for fear of what he would learn, you may conclude that he acted knowingly as I have used that word.

Lima contends that this discussion of conscious avoidance, the so-called "ostrich instruction," was erroneously given because such an instruction is inappropriate where actual knowledge is an issue and no

question of deliberate avoidance exists. In the alternative, Lima argues that even if an "ostrich instruction" was acceptable, the wording of this particular instruction was improper in the context of this case.

At the outset, we note that in assessing the district court's determination to give this instruction, we must review the evidence and any reasonable inferences that can be drawn from that evidence in the light most favorable to the government. *See United States v. Talkington,* 875 F.2d 591, 596 (7th Cir.1989); *United States v. Johnson,* 605 F.2d 1025, 1028 (7th Cir. 1979). In addition, we do not review instructions in lonely isolation, but rather in the context of the trial as an integrated whole. *See United States v. Herrero,* 893 F.2d 1512, 1536 (and cases cited therein).

■ The language used in the district court's "ostrich instruction" was developed by this court in *United States v. Ramsey,* 785 F.2d 184, 190–91 (7th Cir.1986). In *Ramsey,* we noted that every circuit has approved some form of deliberate avoidance instruction. 785 F.2d at 189 (citing cases). Since then we have repeatedly approved the use of the language we provided there. *See United States v. DeFazio,* 899 F.2d 626, 635–36 (7th Cir.1990); *Herrero,* 893 F.2d 1512; *Talkington,* 875 F.2d 591; *United States v. Diaz,* 864 F.2d 544 (7th Cir.1988); *United States v. Holland,* 831 F.2d 717 (7th Cir.1987). While we have warned that "this instruction should be given only when it addresses an issue reasonably raised by the evidence," *Diaz,* 864 F.2d at 549, an ostrich instruction is appropriate when "the defendant claims a lack of guilty knowledge and there are facts and evidence that support an inference of deliberate ignorance." *Talkington,* 875 F.2d at 596 (quoting *United States v. White,* 794 F.2d 367, 371 (8th Cir.1988)) (and cases cited therein).

In *Diaz,* we stated:

The ostrich instruction has been principally employed where there is evidence that the defendant is associated with a group, but where there is also evidence that the defendant consciously was avoiding knowledge of the illegal nature of the group's activity. In most cases, the defendant acknowledges his association with the group but, despite circumstantial knowledge to the contrary, denies knowledge of the group's illegal activity.

864 F.2d at 550.

■ Viewing the evidence in the light most favorable to the government, there was a sufficient basis for the "ostrich instruction" in this case. Lima was presented with a business card decorated with a funeral wreath, bearing only first names and the motto "We guarantee results." Despite this less than professional introduction, Lima hired Bigelow and Vaughan to collect from Lekkas. Lekkas called shortly thereafter and described his rough treatment to Lima.[2] Ignoring this, Lima contracted with Vaughan and Bigelow to collect from Burks. Immediately after the attack at his home, Burks called Lima and described Bigelow and Vaughan's tactics. In subsequent conversations monitored and recorded by the FBI, Burks repeatedly warned Lima that Bigelow and Vaughan had beaten him and threatened his wife and son. Lima consistently responded that "the matter was out of his hands" or "you are dealing with them not me." Thus, the record indicates precisely the type of conscious avoidance of responsibility that is contemplated by the "ostrich instruction."

In his defense, Lima cites a series of Ninth Circuit cases challenging the use of the "ostrich instruction." *See United States v. Alvarado,* 838 F.2d 311 (9th Cir. 1988); *United States v. Pacific Hide and Fur Depot,* 768 F.2d 1096 (9th Cir.1985); *United States v. Beckett,* 724 F.2d 855 (9th Cir.1984). In each of these cases, however, the facts and circumstances indicated ei-

---

2. Lima debates this contention, claiming that he received this call several weeks later. Lima does not explain why Lekkas would wait for such a prolonged period before complaining about Vaughan and Bigelow's attack, and his argument strains credulity. Reviewing the evidence in the light most favorable to the government, we accept Lekkas' testimony that he called shortly after the incident.

ther actual knowledge by the defendant or complete innocence. The choice for the jury was completely binary—there was no evidence of deliberate avoidance of actual knowledge. Thus, the Ninth Circuit held that an "ostrich instruction" under such circumstances unfairly confused the jury. Lima's case presents completely different facts. There was sufficient evidence that Lima willfully avoided strong evidence of wrongdoing by his hired collectors. The question of deliberate avoidance was thus an issue in determining Lima's guilt or innocence and an "ostrich instruction" was entirely appropriate.

■ Alternatively, Lima argues that even if an "ostrich instruction" were appropriate, the language used by Judge Nordberg was unfairly confusing to the jury. Lima objected to the court's refusal to include additional paragraphs concerning reasonable doubt, negligence and other qualifying terms. As we have frequently noted, "small differences in the wording of instructions will rarely have such impact on the jury as to warrant reversal." *United States v. Josefik*, 753 F.2d 585, 589 (7th Cir.1985). *See also Ramsey*, 785 F.2d at 190. Here, the qualifications suggested by Lima add little to the instruction used by the district court. These additions would have been largely repetitive and groundless. Further, the language adopted by Judge Nordberg was expressly approved by this court in *Ramsey*, 785 F.2d at 189. The district court was well within its considerable discretion in using this particular "ostrich instruction."

### III. Bigelow: Hearsay Objections

■ Defendant Bigelow argues in his appeal that the district court erred by admitting into evidence certain out-of-court statements by his girlfriend/fiancee, Maria Collazo. Ms. Collazo testified that Bigelow admitted to her that he had gone to a debtor's house to collect payment, that the debtor had been struck and that a phone had been ripped out of the wall during the incident. The government elicited this testimony, with the court's permission, in or-

der to establish Bigelow's presence at Burks' house.

■ Bigelow now contends that these statements were inadmissible hearsay. We note that Bigelow bears a heavy burden in challenging an evidentiary ruling by the district court. A district court's decision to admit evidence is discretionary in nature and will only be reversed for a clear abuse of that discretion. *See Herrero*, 893 F.2d at 1530; *Jones v. Hamelman*, 869 F.2d 1023, 1027 (7th Cir.1989).

In Bigelow's case this burden becomes unbearable; the statements at issue are not even properly defined as hearsay under the Federal Rules of Evidence. The statements offered through Collazo were admissions by a party-opponent and thus non-hearsay as defined by Fed.R.Evid. .801(d)(2). Judge Nordberg was obviously correct, therefore, in admitting Bigelow's declarations into evidence despite the objections.

■ Bigelow also argues that Collazo's testimony should have included a more complete version of his statements to her. In particular, Bigelow sought permission to admit his statement to Collazo that the FBI agents "had the man they wanted." Bigelow argues that the court's primary reason for barring this testimony was the erroneous belief that out-of-court exculpatory statements are never admissible. This argument badly mischaracterizes the court's rationale for excluding the statements, and is found neither on the record nor in any logical inference based upon it. In short, the contention is ludicrous.

Bigelow's statement that the FBI "had the man they wanted" did create a dilemma for the district court. The difficulty with the declaration was not its exculpatory nature (which was questionable to begin with), but its potential conflict with the principles set forth in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

In *Bruton*, two men, Bruton and Evans, were jointly tried for armed robbery. A postal inspector testified that Evans had confessed that he and Bruton had commit-

ted the robbery. In the instructions to the jury, the judge explained that Evans' confession was admissible only in relation to Evans and should not be considered during deliberations on the question of Bruton's guilt or innocence. The Supreme Court held that admitting Evans' statement into evidence had violated Bruton's right to confront the witnesses against him. The Court held that a jury was incapable of performing the mental gymnastics demanded by the judge's limiting instruction, and thus the danger to Bruton could not be eliminated by that instruction.

■ Bigelow's declaration to Collazo that the FBI "had the man they wanted" obviously implicated Vaughan, Bigelow's co-defendant. Nevertheless, Bigelow contends that under the "doctrine of completeness" the entire substance of his remarks must be allowed to be heard. Bigelow apparently concedes that certain Bruton problems exist; however, he argues that they could have been circumvented by careful redaction. *See Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) (*Bruton* not implicated where confession was properly redacted to avoid reference to co-defendant).

The doctrine of completeness as cited by Bigelow stems from Fed.R.Evid. 106, which provides:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Fed.R.Evid. 106. This rule, however, applies only to *written and recorded materials*. Bigelow cites *United States v. Castro*, 813 F.2d 571 (2nd Cir.1987), as support for extending the doctrine to oral statements. In *Castro*, a police officer was to testify that Castro had informed him that a bag of cocaine found in the house where Castro was arrested belonged to Castro's co-defendant. The district court required redaction of the proffered testimony to eliminate any reference to the co-defendant and allowed cross-examination of the police officer to include references to Castro's failure to identify the cocaine.

In this case, no sterilizing redaction or limiting instruction could sensibly have removed the inculpatory nature of Bigelow's statement. The "man they wanted" could only be Vaughn, as there were only two men involved in the incident at the Burks' house. Allowing Bigelow's statement into evidence could well have jeopardized Vaughan's right to a fair trial. Thus, the district court's proper concerns for Vaughan's rights under *Bruton* foreclosed admission of the statement. The district court was within its discretion in rejecting Bigelow's requested evidence.

## IV. Vaughan: Due Process Challenge to the Federal Sentencing Guidelines

■ Defendant Vaughan raises only one issue on appeal. He contends that the Sentencing Guidelines violate the due process clause of the fifth and fourteenth amendments. We have expressly rejected this challenge in *United States v. Pinto*, 875 F.2d 143 (7th Cir.1990), as has every Court of Appeals that has considered this issue. *United States v. Seluk*, 873 F.2d 15 (1st Cir.1989); *United States v. Vizcaino*, 870 F.2d 52 (2d Cir.1989); *United States v. Frank*, 864 F.2d 992 (3d Cir.1989); *United States v. Bolding*, 876 F.2d 21 (4th Cir. 1989); *United States v. White*, 869 F.2d 822 (5th Cir.1989); *United States v. Allen*, 873 F.2d 963 (6th Cir.1989); *United States v. Lane*, 883 F.2d 56 (8th Cir.1989); *United States v. Brady*, 895 F.2d 538 (9th Cir. 1990); *United States v. Thomas*, 884 F.2d 540 (10th Cir.1989); *United States v. Harris*, 876 F.2d 1502 (11th Cir.1989).

In *Pinto*, we stated that while the Guidelines standardize the sentencing process, they do not eliminate individualized sentences. 875 F.2d at 144–45. That such elements as Vaughan's acceptance of responsibility, his past criminal history, the conduct of his victim, and several other factors were taken into consideration by the sentencing judge indicate that each sentence remains individualized. Moreover, as we noted in *Pinto*, even without such tailoring the Guidelines would pass constitu-

tional muster in a noncapital case, as "criminals aren't entitled to sentences devised by judges rather than legislatures." *Id.* at 145 (citing *United States v. Oxford,* 735 F.2d 276, 278 (7th Cir.1984)). Recently, we affirmed our holding in *Pinto* in rejecting yet another due process challenge to the Guidelines. *United States v. Tholl,* 895 F.2d 1178, 1180 (7th Cir.1990). Vaughan's challenge here must fail as well.

## V. The Government's Challenge of Application of the Sentencing Guidelines

The Sentencing Guidelines provide that the penalties for violation of 18 U.S.C. § 894 are governed by Guideline § 2E2.1 entitled "Making, Financing or Collecting an Extortionate Extension of Credit." This section establishes a Base Offense Level of 20 for these crimes. The government urged application of this Guideline to both Vaughan and Bigelow. Because Lima, however, was apparently not part of an ongoing pattern of extortion, the government suggested that the court apply the lesser § 2B3.2, "Extortion by Force of Threat of Injury or Serious Damage," (Base Offense Level: 18) to determine his sentence. Following a two-day hearing, the district court issued its sentences for the three defendants on May 18, 1989. The court noted at the outset that despite the convictions under 18 U.S.C. § 894, none of the defendants would be sentenced under § 2E2.1 because no evidence of loan-sharking or organized crime activity was presented in this case. Thus, Vaughan and Bigelow were sentenced under the lesser § 2B3.2, while Lima was sentenced under § 2A6.1, "Threatening Communications" (Base Offense Level: 12). In addition, the court departed downward two points from these offense levels for each defendant pursuant to § 5K2.10 based on the contributory conduct of one of the victims, William Burks. Finally, the court applied § 3B1.2(b) to Lima's sentence and thereunder reduced Lima's offense level an additional two points due to his "minor" role in the criminal activity. As a result of these various applications of the Guidelines, the court sentenced Vaughan to 15–months im-

prisonment and three years probation; Bigelow received a 24–month sentence and three years probation; and Lima received a sentence of four weekends in custody, four years probation, four hundred hours of community service and a fine of $5,719.33.

On cross-appeal, the government objects to three aspects of these sentences: first, that the district court applied the wrong Guideline offense section to the defendants' actions; second, that the court improperly departed downward from the suggested sentences by considering the conduct of one of the victims, William Burks; and third, that the court wrongly characterized Lima's role as "minor" and therefore improperly adjusted his offense level. We will consider each of these arguments in turn.

### A. Determination of the Applicable Guideline Section

■ Initially, in considering the application of the Guidelines to these offenses, we note that the district court's determination of which Guideline section to apply is a question of law and thus our review of that decision is plenary. *See United States v. DeCicco,* 899 F.2d 1531, 1535 (7th Cir.1990). Although trial judges are afforded wide latitude on matters of departure from the Guidelines, *see United States v. Schmude,* 901 F.2d 555, 560 (7th Cir.1990), determinations concerning the *scope* of the Guidelines are more strictly construed. *See United States v. Williams,* 901 F.2d 1394 (7th Cir.1990). This distinction stems from the nature of the Guidelines themselves. Their optimistic purpose is to create a consistent range of sentences for similar crimes, while allowing trial judges some flexibility within that framework for difficult or unusual cases. Thus, trial courts, more closely familiar with the facts of each case and the flesh and blood defendants before them, are allowed significant discretion to depart from the established Guidelines where circumstances dictate. The role of this court, however, is to interpret the proper scope of the Guideline sections, and thus we review such questions *de novo.*

 The district court determined that because no evidence of loan-sharking or organized crime was present in this case, application of § 2E2.1 was inappropriate. We disagree. Vaughan and Bigelow were involved in an ongoing pattern of violence in order to collect extensions of credit. Their actions were organized, though crudely so, criminal activity: they circulated business cards, they threatened both Lekkas and Burks, they engaged in repeated phone conversations to collect the debts. This was not an isolated incident of criminal activity. Vaughan and Bigelow intended this enterprise to be their livelihood. Organized crime need not have European roots and clever nicknames to be menacing and dangerous. The use of violence to support an ongoing, criminal business practice is a form of organized crime, and sufficiently dangerous to warrant application of § 2E2.1.

Neither does the fact that Vaughan and Bigelow were attempting to collect legitimate business debts and did not extend the credit themselves remove their conduct from the scope of § 2E2.1. The danger of extortion and loan-sharking lies primarily in the ruthless use of violence and mayhem to ensure collection of the debt. The usurious rates of interest typical to loan-sharking arrangements are criminal as well, but it is the violence, not the corrupt banking practice, that is the principal object of the law. Vaughan and Bigelow used violence in an ongoing, organized criminal activity to collect extensions of credit. Their conduct fell within the scope of § 2E2.1, and the district court should have applied this section in determining their sentences.

 Vincent Lima, as the district court properly found, was not part of this ongoing pattern of criminal activity. Therefore, § 2E2.1 does not govern his sentence. Lima, however, did participate in and benefit from the extortion. As the jury found, Lima knew of the threats and violence used by Vaughan and Bigelow against Lekkas and Burks, and enjoyed the fruits of this scheme. He warned Burks, "Just pay these guys and you won't have any problem." Therefore, Lima's conduct was prop-

erly governed by § 2B3.2, "Extortion by Force or Threat of Injury or Serious Damage."

As the Application Notes to § 2B3.2 state:

This guideline applies if there was any threat, express or implied, that reasonably could be interpreted as one to injure a person or physically damage property, or any comparably serious threat, such as to drive an enterprise out of business. Even if the threat does not in itself imply violence, the possibility of violence or serious adverse consequences may be inferred from the circumstances of the threat or the reputation of the person making it. *An ambiguous threat, such as "pay up or else," ... ordinarily should be treated under this section.*

(Emphasis added.) As the commentary suggests, this section has been broadly construed. The Third Circuit has applied § 2B3.2 to a defendant who sent extortionate threats through the mail, even where the defendant had no clear intention of carrying out the threats. *United States v. Rosen*, 896 F.2d 789 (3rd Cir.1990). As the court there stated, "the intent to carry out the threat is irrelevant to the offense." *Id.* at 791. Similarly, Lima's conduct falls within the scope of § 2B3.2. Lima used threats, and participated in a conspiracy which used threats and violence, to collect an extension of credit. The express language in the commentary discusses actions such as these. The district court, therefore, erred by using the less strict standard of Guideline § 2A6.1, "Threatening Communications," and by refusing to apply § 2B3.2 in determining Lima's sentence.

**B. Downward Departure for Victim Conduct**

 The government also challenges the district court's two-point departure downward under Guideline § 5K2.10 based on the conduct of William Burks, one of the victims. We review the legitimacy of departures from the Guidelines under a three-tiered analysis. *See Williams*, 901 F.2d at 1396. First, we must determine whether the circumstances relied upon by the sentencing judge are sufficiently un-

usual to warrant departure as a matter of law. Review at this level is plenary. *Id.; Schmude,* 901 F.2d at 558–59; *United States v. Missick,* 875 F.2d 1294, 1301–02 (7th Cir.1989). If the circumstances warrant such departure, we review the record below to determine if the facts exist to support the decision to depart from the Guidelines. At this level of review, we will accept the district court's findings unless they are clearly erroneous. *See Williams,* 901 F.2d at 1396; *United States v. Jordan,* 890 F.2d 968, 972 (7th Cir.1989); *Missick,* 875 F.2d at 1301. Finally, we measure the degree of the departure itself under a standard of reasonableness. *Williams,* 901 F.2d at 1396.

Section 5K2.10 provides:

If the victim's wrongful conduct contributed significantly to provoking the offense behavior, the court may reduce the sentence below the guideline range to reflect the nature and circumstances of the offense. In deciding the extent of a sentence reduction, the court should consider:

(a) the size and strength of the victim, or other relevant characteristics, in comparison with those of the defendant;

(b) the persistence of the victim's conduct and any efforts by the defendant to prevent confrontation;

(c) the danger reasonably perceived by the defendant, including the victim's reputation for violence;

(d) the danger actually presented to the defendant by the victim;

(e) any other relevant conduct by the victim that substantially contributed to the danger presented.

Invoking this section, the district court departed downward two points on each defendant's sentence due to the conduct of William Burks. Based on our review of the record, however, we do not believe that Mr. Burks conduct in this offense is the type that warrants departure under § 5K2.10. We accept as given that Burks refused to repay his debts to Lima and M & V, and we do not dispute the district court's recognition that Burks has an unpleasant voice and demeanor. This does not, however,

excuse the defendants' actions; nor does it warrant departure from the Guidelines. Section 5K2.10 contemplates situations where the actions of the victim *provoke* the conduct of the offense. *See, e.g., United States v. Yellow Earrings,* 891 F.2d 650 (8th Cir.1989) (downward departure warranted where victim pushed defendant, verbally abused her, and attempted to publicly humiliate her when she refused his request for sexual intercourse). *See also United States v. Left Hand Bull,* 901 F.2d 647 (8th Cir.1990) (departure based on victim conduct approved in sentence for threatening letter to ex-wife where husband frustrated by reports of wife's abandonment of child). Here, the victim, Burks, did not engage in the behavior contemplated by § 5K2.10. Burks' physical blocking of the doorway of his home could not be considered sufficient physical contact to *provoke* the attack by Bigelow and Vaughan. Burks was at worst an unpleasant and untrustworthy person. This does not excuse beating him, nor the extortion of his funds. The court erred in departing downward based on these facts.

C. Downward Departure for Lima's "Minor Role"

 Guideline § 3B1.2(b), "Mitigating Role," states that "If the defendant was a minor participant in any criminal activity, decrease by 2 levels." The district court stated that Lima had "sought to use what occurred as a lever to collect the debt that he was entitled to be paid," but that he had not planned the conspiracy, and participated in a relatively minor role. Thus, the court departed downward two points. The application of § 3B1.2(b) "involves a determination that is heavily dependent upon the facts of the particular case," *see* § 3B1.2 Commentary, and we will reverse the district court's determination only if such a decision is clearly erroneous. *See United States v. Miller,* 891 F.2d 1265, 1270–71 (7th Cir.1989). The evidence indicates, however, that Lima played a not insignificant role in the conspiracy. He made threats over the phone to Burks and shared information about these conversations with Vaughan and Bigelow. He willingly profit-

**976**

ed from the threats and violence, even when Burks and Lekkas brought them to his attention. The commentary to § 3B1.2 indicates that this section is limited to "a defendant who plays a part in committing the offense that makes him *substantially* less culpable than the average participant" (emphasis added). Lima was not substantially less culpable than Vaughan and Bigelow. The application of § 3B1.2(b) was clear error.

Thus, we conclude that all three sentences must be vacated. The sentences of Vaughan and Bigelow must be recalculated under § 2E2.1 with a Base Offense Level of 20. Lima's sentence must be redetermined under § 2B3.2 with a Base Offense Level of 18. No downward departure should be taken for the conduct of the victim, William Burks; nor is any departure warranted for Lima's allegedly "minor" role.

### VI. Conclusion

The defendants' challenges to their convictions are without merit. In pursuing a debt that was apparently justly owed, their methods became violent and unacceptable. As Shylock learned when his collection attempts became too violent, "For as thou urgest justice, be assured/Thou shall have justice, more than thou desirest." (*The Merchant of Venice*, Act IV, scene i.) The decision below is AFFIRMED. Several errors were committed, however, in the calculation of the defendants' sentences. The sentences are therefore VACATED and REMANDED for redetermination consistent with the Guidelines and this opinion.